UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :

UNITED STATES OF AMERICA           :

                                          :

            - v. -              :        S4 09 Cr. 1239 (PKC)

                                          :

EMILIO FUSCO,                    :

                                          :

                     Defendant.       :

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

## **GOVERNMENT'S SENTENCING MEMORANDUM**

 

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
           of America

DANIEL S. GOLDMAN
NICHOLAS L. McQUAID
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

UNITED STATES OF AMERICA       :
                                    :

       - v. -                :       S4 09 Cr. 1239 (PKC)
                                    :

EMILIO FUSCO,                :
                                    :

                Defendant.       :
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

       The Government respectfully submits this memorandum in advance of the

defendant Emilio Fusco's sentencing scheduled for October 10, 2012, and in response to the

defendant's sentencing submission dated September 26, 2012 ("Def. Mem.").  For the reasons

that follow, the Government submits that a sentence of the statutory maximum of 45 years'

imprisonment is the only available sentence in this case that is sufficient to meet the purposes of

sentencing.

**I.      Background**

       **A.      Procedural History**

       On July 20, 2010, a grand jury in the Southern District of New York returned a

13-count superseding indictment charging Arthur Nigro, Fred Geas, Felix Tranghese, Emilio

Fusco, and Ty Geas principally with racketeering, murder, extortion, and loansharking crimes

relating to their participation in the affairs of the Genovese Crime Family between 2001 and

February 2010.  Fusco was charged with racketeering conspiracy, substantive racketeering

(including his participation in the murders of Adolfo Bruno and Gary Westerman as part of

Fusco's pattern of racketeering activity); extortion conspiracy; extortion; and interstate travel in aid of racketeering.  The Indictment was unsealed on July 23, 2010.  Fusco, who had fled to Italy on April 13, 2010, was arrested on July 29, 2010, and was subsequently extradited to the United States.

Trial for Fusco's co-defendants Arthur Nigro, Fred Geas, and Ty Geas commenced on March 14, 2011, and ended on April 1, 2011, when all three were convicted by a jury on six of the seven counts with which they were charged, including racketeering, racketeering conspiracy, and the murders of Adolfo Bruno and Gary Westerman in further of the charged racketeering enterprise.[1]  On September 12, 2011, all three defendants were sentenced by the Court to terms of life imprisonment.[2]

Fusco arrived in the Southern District of New York on May 13, 2011.  On July 8, 2011, Fusco moved to be released from custody pending trial.  In connection with his motion, Fusco's counsel submitted an affirmation claiming that the purpose of Fusco's trip to Italy in April 2010 was "to attend his sister's 50th birthday party, to visit his elderly and widowed mother who has various health issues and to see his brother who also has substantial health problems."  Fusco Bail Aff. ¶ 5.  The affirmation went on to state that Fusco's return from Italy was rescheduled several times, in part due to "the Iceland volcano eruptions."   Fusco Bail Aff. ¶ 6.  The Court held a hearing on Fusco's bail application on July 26, 2011.  At the hearing, Fusco's counsel, in response to questions from the Court, and after consulting with his client, identified

---

[1]     Arthur Nigro was not charged with the Westerman murder.  In addition, the lone count on which the jury reached a verdict of not guilty was the murder of Adolfo Bruno in order to obstruct justice, pursuant to Title 18, United States Code, Section 1512.

[2]     The transcript of the September 12, 2011, sentencing proceedings is attached hereto as Exhibit A.

three reasons for Fusco's failure to return to the United States from Italy between April and July 2010: (1) disruptions caused by the Icelandic Volcano; (2) health problems experienced by Fusco's mother and another relative; and (3) his pursuit of certain business contracts in Italy. (July 26, 2011 Tr. at 33-36).  At the conclusion of the bail hearing, the Court denied Fusco's bail motion, and then supplemented the record with a written decision dated that same day.  (July 26, 2011 Tr. at 72-74; July 26, 2011 Detention Order).[3]

Trial against Fusco commenced on April 16, 2012, and ended on May 2, 2012, when Fusco was convicted on three counts: (i) Count One, which charged Fusco with conspiring to participate in the affairs of a racketeering enterprise, the Genovese Organized Crime Family, from 2001 through February 2010, in violation of 18 U.S.C. § 1962(d); (ii) Count Three, which charged Fusco with conspiring to extort the owner of various restaurants and strip clubs in Springfield, Massachusetts (James Santaniello) from 2002 through 2006, in violation of Title 18, United States Code, Section 1951 and 2; and (iii) Count Five, which charged Fusco with interstate travel in aid of racketeering from 2002 through 2006, in violation of Title 18, United States Code, Section 1952 and 2.[4]  The jury also found that the Government proved that Fusco

---

[3]     The Court found by clear and convincing evidence that Fusco was a danger to the community and by preponderance of evidence that Fusco was a risk of flight, and that no conditions or combination of conditions could adequately ensure Fusco's return to Court or protect the community.  (July 26, 2011 Detention Order).  As part of the basis for its decision on danger to the community, the Court found, based on the record from the previous trial, "[b]y clear and convincing evidence that [] Fusco was a made-member of the Genovese Crime Family and that he participated in the murders of Adolfo Bruno and Gary Westerman."  (July 26, 2011 Detention Order).  A copy of the July 26, 2011 Detention Order is attached hereto as Exhibit B.

[4]     Because the Indictment did not charge Fusco with a violation of Title 18, United States Code, Section 1952(a)(2), the statutory maximum sentence for Count Five is five years' imprisonment.

had conspired to distribute marijuana as part of his participation in the affairs of the Genovese Crime Family from 2002 through February 2010, which was one of the racketeering acts of Count Two, the substantive racketeering count, although the jury acquitted Fusco on Count Two because it found no other racketeering acts proved.  The jury also acquitted Fusco of Count Four, the substantive extortion of James Santaniello.

On June 15, 2012, Fusco moved to set aside the jury's verdict with respect to Count Three, Count Five, and Racketeering Act Four.  By order dated September 17, 2012, the Court denied Fusco's motion in it entirety.

### B.  Fusco's Conduct

As set forth in detail in the Government's July 20, 2012 opposition to Fusco's post-trial motion and the Presentence Report ("PSR") issued by the United States Probation Office on September 21, 2012, the evidence at trial demonstrated that between the early 1990s and his arrest in July 2010, Fusco was a professional criminal whose primary occupation was to commit crimes with the Genovese Crime Family, first as an associate, and then as a made member or soldier.[5]

Fusco first established himself in the Genovese Crime Family as a trusted associate of Albert "Baba" Scibelli, then the head of a faction of the Genovese Crime Family based in Springfield, Massachusetts.  Fusco, supported by a sizeable crew of associates, earned money from running traditional Genovese Crime Family rackets: loansharking, bookmaking, and the Springfield Crew's numbers operation.  Fusco also dealt marijuana with members of his crew

---

[5]     Fusco, who vehemently denied that he was a member of the Genovese Crime Family in connection with his conviction in the District of Massachusetts, no longer challenges this fact.

and other Genovese Crime Family associates.  Fusco was "made" into the Genovese Crime Family in the mid-to-late 1990s.

In late 2000, Fusco, Scibelli, and a number of Fusco's associates were charged with racketeering, loansharking, illegal gambling, and money laundering in the District of Massachusetts.  Fusco continued to conduct his illegal businesses while the charges were pending, but sought to isolate himself from the street operations while he was on bail and subject to supervision.  Fusco pled guilty to racketeering conspiracy and money laundering conspiracy on June 4, 2003, and was sentenced principally to a terms of 33 months' imprisonment and three years supervised release on September 19, 2003.

In approximately 2001, Arthur Nigro, a longtime member of the Genovese Family who operated out of the Bronx, began to play an increasingly active role in supervising the Springfield Crew.  Nigro appointed Adolfo Bruno, a Genovese soldier, to replace Albert Scibelli and run the Genovese Crime Family in Springfield.  Nigro also began pushing Bruno and the other soldiers in Springfield to become more active in extorting local business owners, including James Santaniello, a local businessman who owned several clubs and restaurants in Springfield.  In response to Nigro's direction, the Springfield crew began extorting Santaniello and others.  Part of the money from the extortions was divided between the members of the Springfield Crew, including Fusco, while another portion was sent to Nigro in New York.

During 2002 and 2003, as Nigro increased his involvement in Springfield, Anthony Arillotta caught the eye of Arthur Nigro, and began to report directly to Nigro in New York.  In the Spring and Summer of 2003, Arillotta, and his close associates Ty and Fred Geas, began to assert themselves in Springfield and rose to prominence within the Springfield faction of the Genovese Crime Family.  They engaged in a series of violent confrontations with a rival

5

crew run by Guiseppe Manzi, and also sought to kill an Genovese associate named Louis Santos who was suspected of cooperating with law enforcement.

During this same time period, Fusco grew close with Arillotta and the Geas brothers. Fusco had known Arillotta since the early 1990s and had dealt marijuana with Arillotta throughout their relationship. Fusco was aware of Arillotta's rise within the Genovese Crime Family and was also aware of the fact that, simultaneously, Adolfo Bruno was losing favor with the bosses of the Genovese Crime Family in New York.

In the fall of 2003, shortly before he surrendered to serve his prison sentence on his conviction in the District of Massachusetts, Fusco participated in the murders of Adolfo Bruno and Gary Westerman. The Bruno murder was triggered by an addendum to Fusco's Presentence Report prepared in connection with his sentencing in the District of Massachusetts ("2003 PSR"), which suggested that Adolfo Bruno had told an FBI agent that Fusco had been made. Fusco immediately showed the relevant page of the 2003 PSR to Anthony Arillotta and Felix Tranghese, who subsequently brought it to Arthur Nigro in New York. Nigro and other leaders of the Genovese Crime Family eventually determined that Bruno should be killed, and Nigro relayed the message to Tranghese, who then told Arillotta and Fusco. Arillotta, Fusco, Tranghese, and the Geas brothers plotted Bruno's murder throughout the fall, eventually recruiting Frankie Roche, an associate of the Geas brothers, to shoot Bruno outside of the Mt. Carmel Society social club in Springfield. On November 23, 2003, Fusco informed Fred Geas that Bruno was going to be at the Mt. Carmel Society that night, critical information that Fred Geas then relayed to Roche. Roche waited outside the club and gunned Bruno down as Bruno was getting in to his car.

Three weeks before Bruno's murder, Arillotta, Fusco, and the Geas brothers

6

murdered Gary Westerman, a long-time Genovese associate, who they believed (correctly) was cooperating with law enforcement.  The Geas brothers lured Westerman to a remote house in Agawam, Massachusetts, for what they told Westerman was a robbery.  Arillotta and Fusco laid in-wait for Westerman in a garage next to the house.   When Westerman arrived, he was shot by the Geases and then beaten over the head with shovels by Arillotta and Fusco.  The Geases, Arillotta, and Fusco then buried Westerman's body in the woods behind the house.

Fusco surrendered to begin serving his prison sentence for the District of Massachusetts case on November 28, 2003.  While in prison, Fusco continued to be involved in the Genovese Crime Family, communicating with Arillotta and others through trusted associates, and growing close with Ernie Muscarella, a former boss of the Genovese Crime Family who was imprisoned with Fusco at a federal prison facility in Fort Dix, New Jersey.  Arillotta continued to provide a portion of the earnings from Fusco's rackets to Fusco's family while he was in prison.

When Fusco was released from prison in 2006, he immediately resumed his criminal activities, reasserting control over many of the street rackets run by the Genovese Crime Family.  Fusco asserted control over the Genovese Crime Family's ongoing extortions, including the extortion of James Santaniello.  Fusco also resumed his marijuana dealing with Genovese Crime Family associates, including Tony Capua, and later with Anthony Arillotta.  In April 2010, three days after the FBI began its evidence recovery effort at the house where Fusco, Arillotta and the Geas brothers had murdered Gary Westerman, Fusco booked a ticket to Italy, leaving five days later.  Fusco flew to Italy on April 13, 2010, and remained there until he was arrested by Italian police on July 29, 2010.

In sum, the evidence at trial, as reflected in the PSR, established that Fusco has dedicated his adult life to committing crimes with and for the Genovese Crime Family.  Fusco

has consistently demonstrated that he is willing to use any means necessary, including murder, to accomplish the Genovese Crime Family's goals, purposes and objectives, and to protect its members and associates from detection and prosecution by law enforcement.

## ARGUMENT

### I.     Applicable Law

#### A.     Sentencing Principles

Section 3553(a) of Title 18, United States Code, provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth specific considerations, including: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants, and the sentencing range under the Guidelines. 18 U.S.C. § 3553(a).

The Guidelines range itself continues to be an important sentencing factor. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), the Court must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceeds.  *Id.* at 49; *see also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with

important exceptions, their calculations were based upon the actual sentences of many judges.'")
(quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

### B.    Fact-Finding at Sentencing

With respect to any fact-finding at a sentencing proceeding, the standard of proof is a preponderance of the evidence. *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004). "When making sentencing determinations, a district court may rely on any facts available to it, including information contained in the Pre-Sentence Report. Further, a sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *Gaskin*, 364 F.3d at 464 (citations omitted). In making its factual findings, a "sentencing court remains entitled to rely on any type of information known to it." *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)); *see also United States v. Brach*, 942 F.2d 141, 144 (2d Cir. 1991) ("sentencing court's discretion is largely unlimited either as to the kind of information [it] may consider, or the source from which it may come.'") (citation omitted); *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988); *accord United States v. Madkour*, 930 F.2d 234, 238 (2d Cir. 1991) (information presented to a court "need only have sufficient indicia of reliability to support its probable accuracy without regard to admissibility. . . ."). As such, in rendering sentence, a district court may rely upon information gleaned from the evidence adduced at trial. *See United States* v. *Sisti*, 91 F.3d 305, 312 (2d Cir. 1996).

## C.    Acquitted Conduct

It is well-settled law that the sentencing court may consider conduct underlying charges as to which the defendant was acquitted when sentencing the defendant, so long as the Government has proven that conduct by a preponderance of the evidence. *See United States* v. *Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008); *United States* v. *Johnson*, 507 F.3d 793, 797 (2d Cir. 2007); *United States* v. *Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.")*; see also United States* v. *Watts*, 519 U.S. 148, 156-57 (1997).[6]   As the Second Circuit reiterated in *Yannotti*:

> We have consistently emphasized that a district court may consider
> all information adduced during trial, including acquitted conduct,
> when sentencing a defendant.  While a fact-finder is required to
> find guilt beyond a reasonable doubt, the sentencing court may
> finds facts relevant to sentencing by the lower preponderance of
> the evidence standard.

541 F.3d at 129 (citation omitted); *see also Vaughn,* 430 F.3d at 527 (emphasizing that there is "no logical inconsistency in determining that a preponderance of the evidence supports a finding about which there remains a reasonable doubt.").  Consistent with these legal principles, judges in this District have repeatedly held defendants responsible at sentencing for charged murders on

---

[6]    Contrary to Fusco's suggestion, (Def. Mem. at 6), there is no higher burden of proof that is applied when considering acquitted conduct at sentencing.  *See Yannotti*, 541 F.3d at 129 (noting that the sentencing court may find acquitted conduct "using the *lower preponderance of the evidence standard*." (emphasis supplied)).  Instead, as Fusco correctly notes, the Second Circuit has cautioned that when relying on acquitted conduct at sentencing, the court should "consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence."  *Vaughn*, 430 F.3d at 527.

which the jury either acquitted the defendant or failed to reach a verdict, when persuaded that the murderous conduct was proven by a preponderance of the evidence.  *See United States* v. *Boyle*, 08 Cr. 523 (CM) (defendant held responsible for murder at sentencing on which jury acquitted at trial); *United States* v. *Bright*, 06 Cr. 242 (WHP) (defendant held responsible for murder at sentencing on which jury acquitted at trial); *United States* v. *Davis*, 05 Cr. 1147 (LAK) (defendant held responsible for murder at sentencing on which jury failed to reach a verdict at trial); *United States* v. *Johnson,* 02 Cr. 0150 (LAP)  (defendant held responsible for murder at sentencing on which jury acquitted at trial); *United States* v. *Williams*, 00 Cr. 237 (VM) (defendant held responsible at sentencing for murder and attempted murder on which jury failed to reach a verdict); *see also United States* v. *Yannotti*, 04 Cr. 690 (SAS) (defendant held responsible at sentencing for violent assault on which jury acquitted at trial).[7]

## II.    Discussion

In this case, both the Sentencing Guidelines and the statutory factors set forth in Section 3553(a) counsel for a sentence of 45 years' imprisonment, the statutory maximum sentence.  A sentence of 45 years is necessary because of the extreme gravity of Fusco's pervasive and persistent criminal conduct, his utter lack of remorse for committing such crimes,

---

[7]    Courts in other circuits have similarly relied on acquitted murder conduct to impose enhanced sentences. *See, e.g., United States* v. *Lynch*, 367 F.3d 1148, 1162 (9th Cir. 2004) (affirming application of murder enhancement – and a 20-year statutory maximum sentence for Hobbs Act robbery – where district court found that victim was killed during robbery, notwithstanding jury verdict that Government had failed to prove defendant's involvement in murder by proof beyond a reasonable doubt); *United States* v. *Newton*, 326 F.3d 253, 265 (1st Cir. 2003) (affirming application of murder enhancement even though defendant had previously been acquitted of murder in state court); *United States* v. *Gamez*, 301 F.3d 1138, 1145 (9th Cir. 2002) (affirming application of murder enhancement even though the defendant was acquitted of murder, and even though sentencing court specifically found that defendant did *not* commit murder, where murder was both foreseeable and in furtherance of the defendant's marijuana importation conspiracy).

and his unwavering devotion to the Genovese Crime Family, a treacherous enterprise devoted solely to the commission of crime.  Moreover, the fact that Fusco committed all of the crimes discussed herein – including the murders of Gary Westerman and Adolfo Bruno – while under some sort of court-authorized supervision or prison sentence underscores the need here for specific deterrence.  In addition, a sentence of 45 years' imprisonment is warranted to promote respect for the law, provide just punishment for Fusco's crimes, and to avoid unwarranted disparities with Fusco's co-defendants and with other individuals who have committed two murders and devoted their lives to the mafia.  For all of these reasons, a sentence of 45 years is not only just and reasonable, but it is the only sentence available to the Court that would satisfy the purposes of sentencing in this case.

### A.      The Appropriate Offense Level

The evidence at trial established by a preponderance of the evidence that Fusco was responsible for the murders of Adolfo Bruno and Gary Westerman, and also established that Fusco is responsible for the distribution of thousand of pounds of marijuana.  Fusco should also be held responsible under the Sentencing Guidelines for having extorted more than $250,000 from James Santaniello and others; for his involvement in gambling and loansharking; and for his leadership in the Genovese Crime Family.  Taking into account the full extent of Fusco's criminal conduct and all the appropriate enhancements, the correctly calculated Sentencing Guidelines range for Fusco is life imprisonment.

### 1.      Presentence Report

The Probation Office applied Section 2E1.1, which governs racketeering offenses, to the conduct in this case.  Pursuant to Section 2E1.1, the offense level is the higher of 19, or the offense level applicable to the underlying racketeering activity.  To determine the offense

level for the racketeering activity, the Probation Office applied the grouping analysis set forth in Chapter Three of the Guidelines, and identified two groups of conduct: one group related to the extortion of James Santaniello (which includes both Counts Three and Five) and a second group related to Fusco's narcotics trafficking.  For the first group, the Probation Office applied Section 2B3.2(b)(1), which provides for a base offense level of 18; a two-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(1), because the conduct involved express or implied threats of bodily injury; a three-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(2) and § 2B3.1(b)(7)(D), because the extortionate conduct exceeded $250,000; and a further two-level enhancement, pursuant to U.S.S.G. § 3B1.1(c), because Fusco was a manager and supervisor of the scheme. The resulting total offense level for Group One, as calculated by the Probation Office, is 25.

For the second group, the Probation Office applied a base offense level of 20, pursuant to U.S.S.G. § 2D1.1(c)(10), because the conduct involves less than 50 kilograms of marijuana based solely on the jury's verdict on Racketeering Act Four of Count Two.  The Probation Office further determined that no offense level enhancements applied.  The resulting total offense level for Group Two, as calculated by the Probation Office, is 20.

Applying the grouping analysis set forth in Section 3D1.4, Group One constituted one Unit and Group Two constituted one-half Unit (because Group Two is between five and eight levels less serious than Group One), which resulted in a total of one-and-one-half units, and a one-level increase in the combined offense level.  As a result, the combined adjusted offense level in the PSR is 26.  The Probation Office determined that the total offense level is also 26 because Fusco had not demonstrated acceptance of responsibility.

The Probation Office calculates that Fusco has five criminal history points stemming from his 2003 conviction in the District of Massachusetts and the fact the Fusco

13

committed the instant offenses while under multiple criminal justice sentences, pursuant to U.S.S.G. § 4A1.1(d), and therefore falls in Criminal History Category III.  Both parties agree that the Probation Office's criminal history calculation is correct.

At offense level 26 and Criminal History Category III, the Sentencing Guidelines range is 78 to 97 months' imprisonment.  The Probation Office recommends a sentence at the bottom of that range.

### 2.       Chapter Three  Grouping Analysis Applies in this Case

The Government agrees with defense counsel and the Probation Office that Section 2E1.1 applies to the offense conduct and that Fusco's conduct should be grouped pursuant to Chapter Three of the Guidelines.  As explained below, Fusco's offense conduct falls into six groups: Group One, the Murder of Adolfo Bruno; Group Two, the Murder of Gary Westerman; Group Three, Extortion and Extortion Conspiracies; Group Four, Loansharking; Group Five, Distribution of Marijuana; and Group Six, Illegal Gambling.[8]  Applying the grouping analysis set forth in Chapter 3, the total offense level is 46, resulting in a recommended Sentencing Guidelines sentence of life imprisonment.

### 3.       Group One - Fusco is Responsible for the Murder of Adolfo Bruno

The evidence at trial established that Emilio Fusco is responsible for the premeditated and intentional murder of Adolfo Bruno.  Here, because the most analogous federal offense to the killing of Bruno is first degree murder under Title 18, United States Code, Section

---

[8]       The Government originally took the position that a seventh group, interstate travel in racketeering, should apply in this case.  Upon further reflection, the interstate travel is addressed in the third group, extortion and extortion conspiracies, which encompasses not only the extortion of James Santaniello (the specific extortion for which Fusco was convicted) but all the extortionate activity conducted by the Genovese Crime Family in Springfield between 2001 and February 2010.

1111, which applies to "murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing," 18 U.S.C. § 1111, the applicable section of the Guidelines is Section 2A1.1(a), which applies to "First Degree Murder."   The base offense level is therefore 43, pursuant to U.S.S.G. § 2A1.1(a).[9]

At trial, three cooperating witnesses – Anthony Arillotta, Felix Tranghese, and Frankie Roche – testified that Emilio Fusco was involved in the planning and/or execution of the murder of Adolfo Bruno.  All three of these witnesses pleaded guilty to their own involvement in the murder of Adolfo Bruno and admitted as much on the witness stand.  Moreover, each of the three cooperating witnesses was credible during their testimony.  They were subjected to intense and skillful cross-examination by an experienced defense lawyer who had the benefit of reviewing their testimony from the previous trial, and each provided forthright and truthful answers that demonstrated their veracity.  It bears emphasis that each of the three cooperating witnesses provided testimony that, if believed, was in and of itself sufficient to prove Fusco's involvement in the Bruno murder beyond a reasonable doubt, and certainly by a preponderance of the evidence.

During the Summer and Fall of 2003, Al Bruno was losing favor with Arthur

---

[9]      While the Indictment charged Fusco with Second Degree Murder under New York (for the Bruno murder) and Massachusetts law (for both the Bruno and Westerman murders), it is well-established that the relevant consideration for purposes of the Sentencing Guidelines is whether the conduct qualifies as First Degree Murder under Federal Law.  See *United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992) (noting that while New York law "would have characterized the murder of [victim] only as second degree murder, the task of the district court was to find the offense level corresponding to the most analogous federal offense" and concluding that "the district court did not err in concluding that the most analogous federal offense was first degree murder under § 1111."  *See Guzman v. United States*, 277 F. Supp. 2d 255, 260 (S.D.N.Y. 2003) (Scheindlin, J.); *see also United States v. Stantini*, 2008 WL 901449 at *6 (E.D.N.Y. March 27, 2008).

Nigro, the boss of the Springfield faction of the Genovese Crime Family, for a variety of reasons. First, Nigro felt that Bruno was not kicking up enough money to him from the various rackets Bruno was overseeing in Springfield. (Tr. 313). Second, Nigro was upset that Bruno decided to keep Louie Santos close to him, even though a private investigator had determined that Santos was cooperating with law enforcement. (Tr. 301-06). Third, Bruno came to the defense of Albert "Baba" Scibelli, even though Scibelli violated mob rules by admitting, in writing as part of a guilty plea to racketeering charges, that he was a member of the Genovese Crime Family. (Tr. 308-12). And fourth, Nigro sided with Ray Ruggiero in a beef that Ruggiero had with Bruno about a $150,000 to $200,000 investment in a cigarette deal that never materialized, which angered Bruno. (Tr 313-16). For all these reasons, Nigro was preparing to put Bruno on the "pay-me-no-mind list," according to Arillotta, (Tr. 317), or the "pay-no-mind list," according to Tranghese, (Tr. 1137). To that point, however, there was no discussion of murdering Bruno. (Tr. 318).

Both Arillotta and Tranghese testified that there was a single catalyst that transformed the discussion about Al Bruno: a page from the 2003 PSR, Emilio Fusco's pre-sentence investigation report in the District of Massachusetts. (GX 202). In connection with the sentencing, the Probation Office prepared the 2003 PSR, which stated, among other things, that Fusco was a made member of the Genovese Crime Family. (Tr. 113). Fusco objected to the statement that he was a made member of the Genovese Crime Family. (Tr. 113).

The Probation Office provided Fusco with the final, revised version of the 2003 PSR on September 9, 2003. (Tr. 115). That final version contained an addendum that included additional evidence to support the assertion that Fusco was, in fact, a made member of the Genovese Family. The addendum, at page 101, included a paragraph that stated: "Testimony of

16

FBI Special Agent Clifford Hedges: Special Agent Hedges will testify that on February 12th, 2001, Al Bruno confirmed that FUSCO had been 'made' while Bruno was in jail." (GX 202; Tr. 115).

When Fusco received the PSR, he immediately showed it to Arillotta and Tranghese, and they all agreed that Tranghese would bring the piece of paper to Nigro in New York. (Tr. 320-22; Tr. 1137-40). Tranghese brought it to Nigro at a laundromat in the Bronx, the location where Tranghese and Arillotta testified that they usually met Nigro. (Tr. 1141; GX 166a-e). After consulting with other high-ranking members of the Genovese Crime Family, Nigro gave Tranghese the order to kill Bruno. (Tr. 321-324; Tr. 1140-44). Tranghese relayed Nigro's order to Fusco and Arillotta the day after Tranghese received it. (Tr. 322-23; Tr. 1145). Subsequently, Nigro gave the order to kill Bruno directly to Arillotta a few weeks later, (Tr. 327), and then Arillotta, Tranghese, and Fusco met with Nigro at the laundromat in the Bronx, where they further discussed the murder plot, (Tr. 328).

Once the order to murder Adolfo Bruno was transmitted from Nigro in New York to Tranghese, Arillotta and Fusco in Springfield, Arillotta brought in the Geases, and Arillotta, Fusco, Tranghese and the Geases developed various plans for how to kill Bruno. (Tr. 326-338). Some of these possible plans included taking Bruno to dinner, after which he would be shot; luring him into a car to go to New York, where he would be shot and then crushed at a car junkyard; or simply shooting him at the Mt. Carmel Society Social Club. (Tr. 325-26, 329-330). Among other steps taken to explore the various options, Fusco attempted to contact an associate in Connecticut, Frank Zimmitti, who had a car junkyard. (Tr. 332). Fusco also liked the idea of executing the murder at the Mt. Carmel Club because Bruno was there a lot and the co-conspirators knew the patrons of the Club, who could more easily be persuaded not to testify if

17

called as witnesses.  (Tr. 332-33).  Fusco, Arillotta, the Geas brothers, and Tranghese took steps

to attempt several of the plots, but none of their plans came to fruition.  (Tr. 331-32).  They

continued to discuss the murder plot, including at Arillotta's daughter's christening at La Roma

restaurant, where both Arillotta and Tranghese testified that they, along with the Geas brothers

and Fusco, had a discussion about the Bruno murder plot during which Tranghese made a

gesture with his hand in the form of a gun that was pointed at Bruno.  (Tr. 335-36, 1148-49).

      Ultimately, because they were having difficulty luring Bruno somewhere where

he could be murdered discretely, Arillotta, Fusco and the Geases decided to enlist Frankie Roche

to commit a "cowboy hit," meaning to kill Bruno publicly.  (Tr. 338).  Fred Geas provided

Roche with one gun, a .380 caliber, one of the many .380s the Geases had, and Emilio Fusco

also provided a .45 caliber gun to be used for the murder.   The gun provided by Fusco was

placed behind a dumpster at the Family Pizzeria Restaurant, where Roche then picked it up.[10]

(Tr. 339).  Roche agreed, understanding simply that the Geas brothers (and, indirectly, Arillotta)

believed that Bruno was a "rat."  (Tr. 934).  Sometime in November of 2003, Roche went with

Fred Geas to La Fiorentina coffee shop to meet with Emilio Fusco, who handed Geas and Roche

a copy of Government Exhibit 202 with everything redacted but Paragraph C, the relevant

paragraph relating to Bruno's statements to Cliff Hedges.  (Tr. 935).

      After agreeing to kill Bruno and obtaining the guns with which to do so, Roche

found it difficult to find Bruno at a place where Roche could shoot him.  (Tr. 341; Tr. 941-44).

---

[10]    Roche testified that Fred Geas told Roche that Arillotta would leave a .45 caliber gun
by the dumpster at Family Pizzeria.  (Tr. 939).  Given that Fred Geas was Roche's lone
contact throughout the murder planning, and that Roche knew Arillotta to be the leader of his
crew, it is unsurprising that Fred Geas did not volunteer that Emilio Fusco, whom Roche did
not know well, would actually be the one leaving the gun at the dumpster.

Ultimately, it was decided that Fusco would alert Fred Geas when Bruno would be at the Mt. Carmel Society social club so that Fred Geas could then alert Roche.  (Tr. 340-41; Tr. 943-44). On November 23, 2003, Fred Geas called Roche in the early evening from a payphone to alert Roche that Bruno would be playing in a card game at the Mt. Carmel Society that evening.   (Tr. 947-949).  Roche then went to the Mt. Carmel Society, waited for 15 or 20 minutes for Bruno to walk out of the club, and then unloaded the .45 caliber gun into Bruno as Bruno was getting into his car, killing him.

In the days after the murder, Fred Geas took steps to help get Roche out of town. (Tr. 953-955).  Fred Geas eventually drove Roche down to New York where Roche was delivered to Mario Imbesi, a Genovese Crime Family associate.  (Tr. 954-55).

The overlapping testimony of these three witnesses convincingly proved that Emilio Fusco played a critical role in providing the motive to murder Al Bruno, as well as the planning and execution of the murder.  As described above, although none of the cooperating witnesses have spoken to each other since at least 2005, their respective testimony about specific, critical aspects of the murder plot was consistent, demonstrating the accuracy of their testimony, the witnesses' credibility, and Fusco's guilt.  For example, both Arillotta and Tranghese testified almost identically about the meeting at the Emporium with Fusco where Fusco showed the relevant portion of the 2003 PSR.  (Tr. 320-22; Tr. 1137-40).  Arillotta and Tranghese also testified consistently about the events that took place after the meeting at the Emporium News, when Tranghese brought the 2003 PSR down to New York, and eventually was given the order to kill Bruno, (Tr. 321-324; Tr. 1140-44),  and about the meeting at the Friendly's in East

19

Longmeadow where Tranghese relayed Nigro's order to kill Bruno to Fusco and Arillotta.[11]  (Tr. 322-24, 1145).

In addition, both Arillotta and Tranghese recounted an almost identical discussion involving Emilio Fusco at Arillotta's daughter's christening at La Roma Restaurant, in which Tranghese joked about killing Bruno.  (Tr. 335-36, 1148-49).  In describing the events at the christening, both Arillotta and Tranghese described the same gesture that Tranghese made when joking about killing Bruno right then and there.  (Tr. 335-36, 1148-49).  Moreover, both Arillotta and Roche gave an identical description of the plan to kill Bruno at the Mt. Carmel Society, including the critical detail that Emilio Fusco was tasked with notifying Fred Geas when Bruno would be at the Mt. Carmel Society so Roche could execute the murder.  (Tr. 340-41; Tr. 943-44).[12]

While these are only a few examples of the overlapping testimony of the cooperating witnesses, the consistent testimony about specific details of the murder plot of Al Bruno is precisely the type of testimony that demonstrates their truthfulness.  To be sure, Arillotta and Tranghese had a different recollection of dates, which is to be expected when recounting

---

[11]  Once Fusco provided the relevant page of the PSR to Arillotta and Tranghese, decided with them to send that page to Nigro in New York, and learned that Nigro had ordered Bruno to be killed, it was more than reasonably foreseeable to Fusco that he had triggered a set of events that might culminate in Bruno being murdered.  Even if Fusco had not had any other involvement in the Bruno murder after the meeting at the Emporium, those first events alone would be sufficient evidence to hold Fusco responsible for the murder of Adolfo Bruno under Section 1B1.3 of the Sentencing Guidelines, which states that the defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. §1B1.3(a)(1)(B).

[12]  Although it did not relate to the plot to kill Al Bruno, the Court may also recall the near-identical versions of the incident at the Civic Pub recounted by Arillotta and Roche. (Tr. 285-91, 908-11).

details from nine years prior, but their consistent recollection of the *events* that led to the murder of Al Bruno conclusively proves that Emilio Fusco participated in the Bruno murder.

The overlapping testimony of the three cooperating witnesses was further corroborated by other types of evidence introduced at trial. For example, all three cooperating witnesses recognized Government Exhibit 202, the relevant portion of Fusco's 2003 PSR that, according to Arillotta and Tranghese, was the catalyst for the order to murder Bruno.

Furthermore, telephone call records admitted into evidence corroborated the testimony of the witnesses, particularly Roche. First, Roche testified that Fred Geas called him at Billy Johnston's house the evening of the murder from what Roche believed to be a payphone in West Springfield. Government Exhibit 704 showed a telephone call at 5:47 p.m. on November 23, 2003, from a payphone near Ty Geas's apartment in West Springfield to Billy Johnston's home. Second, Roche testified that when he met Fred Geas the night after the murder in Enfield, Connecticut, Geas was frustrated about not being able to get in touch with Mario Imbesi from payphones nearby. Government Exhibit 706 shows approximately 15 calls from two payphones in Enfield, Connecticut, Billy Johnston's cellphone (used by Roche) and even Fred Geas's cellphone, which perfectly corroborates Roche's testimony.

In sum, the overlapping testimony of *three* cooperating witnesses – all of whom admitted their involvement in the Bruno murder, pleaded guilty to it, and implicated Emilio Fusco in the plot and execution of it – along with powerful, neutral corroboration, proved that Emilio Fusco participated in the murder of Al Bruno.

In his sentencing memorandum, Fusco presents a host of arguments against finding Fusco responsible for the Bruno murder, all of which have no merit, and some of which are facially absurd. Fusco argues that Arillotta was not a credible witness; Fusco would not

21

participate in a murder with the Geas brothers; the government lacked *any* corroboration; the testimony of Frankie Roche about the timing of events on the night of the murder demonstrates that Roche was lying; the 2003 PSR was not the catalyst for Nigro's order to murder Bruno; and Fusco had little incentive to murder Bruno because he would be going to jail shortly.  (Def. Mem. at 12).  Fusco's arguments not only misstate the evidence at trial but reveal fundamental misunderstandings of life as a sworn member of the Genovese Crime Family.

First, with respect to the arguments relating to the cooperating witnesses' credibility and lack of corroboration, the recitation above, which demonstrates the consistently overlapping testimony of the three witnesses, as well as the powerful corroboration from the 2003 PSR and phone records, undermines Fusco's conclusory and baseless assertions.  Each of the cooperating witnesses admitted their own guilt in the murder plot, explained that it was motivated because Bruno was thought to be a "rat" based on Government Exhibit 202, and placed Fusco in a similar role in the murder plot – someone who helped determine how to go about the murder, provided the murder weapon, and alerted the murderer to Bruno's whereabouts on the night of the murder.

Fusco specifically attempts to undermine Roche's credibility by relying on grand jury testimony from Billy Johnston,[13] which purports to contradict Roche's account of obtaining the weapon from the Family Pizzeria Restaurant and the timing on the night of the murder.  First, Roche testified that he retrieved a .45 caliber gun *and* an extra clip for that gun at Family Pizzeria.  (Tr. 940, 1052).  Johnston apparently mistook the additional clip for a small gun, but given that Roche repeatedly spoke about carrying around both the .45 caliber gun and the .380

---

[13]     At the trial in *United States v. Nigro*, portions of Johnston's grand jury testimony were read into the record because Johnston was unavailable to testify.

caliber gun provided to him by Fred Geas, and that a .22 caliber gun is a very small gun, it would make no sense for anyone to give Roche a .22 caliber gun along with a .45 caliber gun, which is a very large gun.[14]

Second, Fusco somewhat surprisingly attempts to further impeach Roche by focusing on his testimony related to his own description of shooting and killing Al Bruno. To that end, Fusco notes a minute discrepancy in the sequence of events that Roche recounted. In fact, Roche's testimony at this trial was remarkably consistent with that in the *Nigro* trial, and the discrepancy noted by Fusco is literally a matter of minutes. It further defies logic that Roche would fabricate receiving the phone call from Fred Geas, which is not disputed by Fusco, in the face of neutral corroboration from phone records that Geas called Roche from a payphone at 5:47 p.m., which call lasted 17 minutes. This desperate attempt to find an inconsistency in Roche's overwhelmingly consistent recitation of his role in the Bruno murder should be disregarded by the Court.

Third, Fusco's assertion that the PSR was not, in fact, the motivation behind the murder is apparently based on a theory that the plot was hatched by Arillotta and the Geas brothers that "did not involve Fusco or Tranghese." (Def. Mem. at 14-15). This argument simply makes no sense. First, there is no dispute that Tranghese, a senior member of the Genovese Crime Family, pleaded guilty to being a member of the Genovese Crime Family and murdering Adolfo Bruno as part of his involvement in the Genovese Crime Family. Second, both Arillotta and Tranghese testified that Nigro ordered the murder. In fact, Fusco's sentencing memorandum

---

[14]     On cross-examination, Roche flatly denied he ever picked up a .22 caliber gun from Family Pizzeria Restaurant. (Tr. 1053).

itself acknowledges that Nigro ordered the murder.[15]  (Def. Mem. at 12, 17).  Third, the Geas brothers were not members of the Genovese Crime Family, and there is no basis in evidence, fact or common sense to support the notion that the Geas brothers would be responsible for hatching a plan to murder Bruno, the Capo of the Springfield faction of the Genovese Crime Family. Moreover, as described above, all of the witnesses pointed to the 2003 PSR as the catalyst for the murder, and both Arillotta and Tranghese provided a near-identical recitation of the events that lead from Fusco bringing the PSR to Tranghese and Arillotta, to Tranghese bringing it down to New York, to Nigro returning the document to Tranghese and ordering Fusco, Tranghese and Arillotta to kill Bruno.

Finally, several of Fusco's arguments are, in fact, consistent with the evidence supporting Fusco's involvement in the murder.  For example, Roche admitted that he destroyed a bar belonging to Emo Gonzalez, and that Bruno was looking for him to pay Gonzalez some money.  While the facts of the Emo Gonzalez dispute are largely undisputed, Roche flatly denied that the bar incident played any role in the Bruno murder, and Fusco points to no evidence that supports a different conclusion.  Moreover, Arillotta, Fusco, and the other co-conspirators knew about this dispute, which was, in fact, a reason in *favor* of enlisting Roche to do the murder in order to provide an alibi and insulate them from law enforcement.  Indeed, the ever-shrewd Fusco, who spent his life as a professional criminal attempting to insulate himself from law enforcement, would never have considered shooting Bruno himself on November 7, as the defendant's memorandum suggests, (Def. Mem. at 14), because that would have exposed Fusco much more than a shrewd criminal like him would ever risk.  Furthermore, both Arillotta and

---

[15]     Nigro, of course, was convicted of ordering the Bruno murder at trial last year.

Tranghese testified that Bruno had fallen out of favor with Nigro for all of the reasons stated, with support from transcript citations, in the defendant's memorandum.  (Def. Mem. at 17).  Notably, however, the defendant provides no citation for his assertion that these were the reasons Nigro ordered the Bruno murder, likely because there is no evidence in the record to support such an assertion.

In sum, three separate witnesses testified credibly, supported by significant corroboration, that Fusco participated in the plot to murder Adolfo Bruno and the execution of that murder.  Because the evidence supports a finding by at least a preponderance of the evidence that Fusco participated in the murder, this group has an offense level of 43.

### 4.      Group Two - Fusco is Responsible for the Murder of Gary Westerman

The evidence at trial also established that Emilio Fusco is responsible for the intentional killing of Gary Westerman.  As explained above, the relevant Guidelines Section is therefore 2A1.1 and the base offense level is 43.

Anthony Arillotta testified that Westerman was killed on November 4, 2003, by Arillotta, Emilio Fusco, and the Geas brothers, in a plot that was hatched that same day by Ty and Fred Geas.[16]  (Tr. 357).  The Geas brothers, in consultation with Arillotta, decided to lure Westerman to a deserted house in Agawam, Massachusetts, owned by Joe Iellamo, a Genovese associate, by telling Westerman that they were going to rob the house.  (Tr. 358).  The plan was to

---

[16]      There were at least two reasons why the Geases and Arillotta decided to kill Gary Westerman that day.  First, the Geas Brothers had recently received confirmation from their attorney, Dan Kelly, that Westerman was cooperating with law enforcement and believed his cooperation posed a threat to their criminal activities.  (Tr. 354-57).  Second, Ty Geas in particular was frustrated by their failure to execute other murder plots they had undertaken in the Summer and Fall of 2003 and wanted to demonstrate that their crew was capable of serious violence to warrant their reputation as feared mobsters.  (Tr. 357-58).

kill Westerman at Iellamo's house and bury the body in a hole that they had previously dug at Iellamo's house in connection with a different murder plot. (Tr. 358-59). The Geas brothers asked Arillotta to recruit Fusco to help them because they were concerned about Westerman's large size. (Tr. 360). Arillotta agreed, and eventually met up with Fusco at the Fusion Café, a restaurant in Springfield. (Tr. 361). Arillotta expained the plan and told Fusco that the Geases asked for Fusco's assistance, which Fusco agreed to provide. (Tr. 361). After having a drink, Arillotta and Fusco were driven to a parking lot near Iellamo's house. (Tr. 362). Arillotta and Fusco then walked to Joe Iellamo's house and waited in his garage for half an hour. (Tr. 362-64). Arillotta and Fusco discussed the reasons for killing Westerman while they waited, including the fact that Westerman was cooperating with law enforcement. (Tr. 362-64).

When the Geases and Westerman arrived at Iellamo's house, the Geases shot Westerman repeatedly, injuring him but not killing him. (Tr 364-65). After hearing Westerman scream, Arillotta and Fusco came out of the garage and, when Westerman continued to struggle, Arillotta and Fusco beat Westerman over the head with shovels. (Tr. 365-66). Fusco, Arillotta, and the Geas brothers then carried Westerman's body to the hole in the backyard, where Fred Geas shot him one more time at close range. (Tr. 366). Westerman's body was then thrown into the hole and Arillotta and Fusco used the same shovels to fill the hole with dirt. (Tr. 367).

Arillotta's account of the Westerman murder generally, and Fusco's participation in the murder particularly, was heavily corroborated by other evidence introduced at trial. First, the Government introduced testimony and physical evidence from the FBI's evidence recovery at Joe Iellamo's house between April 5 and April 9, 2010. (Tr. 663-687). During its careful and thorough investigation of the site, the FBI found the body of Gary Westerman in the exact spot where Arillotta had indicated the body had been buried. In addition, the FBI found other physical

26

evidence, including shell casings and bullets, a ski mask, and a stun gun, that were consistent with

Arillotta's account of the means, manner and location of the murder.  (GX 462; GX 458; GX

465; GX 490).  Two critical pieces of evidence recovered at the site specifically corroborated

Arillotta's testimony that Fusco participated in the murder.  First, an autopsy of Gary Westerman

revealed skull fractures and a particular indentation on Westerman's skull that was consistent

with the testimony that Westerman was repeatedly hit over the head with a shovel.  (GX 474; Tr.

791).  Second, during the excavation of the hole in which Westerman was buried, the FBI

recovered an empty cigarette pack and the remains of eight cigarettes scattered around the hole.[17]

The cigarettes were important evidence corroborating Arillotta's testimony about Fusco's

participation because the evidence at trial conclusively established that Fusco was a chain smoker

whereas none of the other participants in the murder smoked cigarettes.  (Tr. 368; Tr. 969).

In addition, there were several other significant pieces of evidence that

corroborated Arillotta's account of the Westerman murder.  First, the phone records from Ty and

Fred Geas showed that the Geas brother stopped speaking on their phones as of 8:01 pm on

November 4, 2003, and neither registered a phone call again until the exact same time – 12:32

a.m. the next day.  These records which naturally indicate that the Geas brothers had their phones

_____

[17]      Fusco disputes the Government characterization of the cigarette remains as cigarette
butts, and instead asserts that there is "more than a reasonable possibility" that the cigarettes
belonged to Westerman himself, who, according to the trial testimony, had smoked one pack
of cigarettes per day for one year as of 1997.  (Def. Mem. at 11.)  Even if Westerman were
still a smoker six years after 1997, this argument is nevertheless belied by the evidence at
trial, which demonstrated that the eight cigarettes were scattered around the hole.  It is purely
a matter of common sense to conclude that the cigarettes would only have been scattered
around the hole if they had been removed from the cigarette pack and were actually smoked.
Thus, the only explanation consistent with the evidence at trial was that the cigarettes were
the filters that had been smoked and thrown in the hole during the time it took to fill in the
hole more than six years prior to their discovery.

off while committing the murder and disposal of Westerman before turning their phones on at the same time.  (GX 712; GX 714).  Ty Geas's phone records also corroborated Arillotta's testimony that he had met up with Fusco at Fusion restaurant before going to Joe Iellamo's house, as the last call to or from Ty Geas's cellphone on November 4 was a 58 second call from the Fusion Café to Ty Geas's cellphone.  (GX 714).  While Arillotta did not recall making a call to Ty Geas before leaving the Fusion Café, (Tr. 624), this phone call is consistent with Arillotta's recitation of the sequence of events that night and his trip to the Fusion Café to pick up Emilio Fusco.

Second, Trooper Liam Jones testified that on November 10, 2003, six days after the Westerman murder, Jones, who was investigating the murder, tried to speak with the Geas brothers at a jewelry store owned by their uncle.  (Tr. 852).  Jones told the Geas brothers that he was there to talk about the disappearance of Gary Westerman, but the Geas brothers refused to speak to him and then drove away.  (Tr. 852-53).  Jones attempted to determine where they had gone, and traced them to the La Fiorentina coffee shop 15 or 20 minutes after the encounter at the jewelry store.  (Tr. 853).  Jones then went inside the coffee shop and found Fred Geas at a table speaking to Emilio Fusco.  (Tr. 854).  When Jones approached the table, Fusco seemed startled, got up, and walked away.  (Tr. 855).  Fred Geas seemed nervous as well.  (Tr. 855).  Jones's account of the Geas brothers reaction to his investigation on November 10 is telling evidence that Fusco was involved in the Westerman murder.  The reasonable inference is that the Geas brothers, having just been approached by Trooper Jones to discuss the Westerman murder, immediately went to speak to Fusco to report this development.  This inference is supported by the nervous reactions of Fred Geas and Emilio Fusco when Trooper Jones approached their table in La Fiorentina.

Third, the Government introduced recordings of three prison calls between Fred

28

Geas and Ty Geas during the days of the FBI's evidence recovery operation at Joe Iellamo's house.  (GX 801-803; GX 801-T-803-T).   During their conversations, the Geas brothers repeatedly make thinly veiled and despondent references to the FBI investigation of the Westerman murder site, which was widely covered in the media, (GX 429(b)-(f)), and Ty Geas makes clear that he anticipates that he will soon be arrested.  (GX 801-803; GX 801-T-803-T).  Towards the end of the last conversation, on April 10, 2003, Ty Geas says he is "trying to keep [his] head" and not act like an "animal cry baby."  (GX 803-T).  Fred Geas then asks Ty Geas whether he's seen the "broken English guy again?"  After Ty Geas said he had, Fred Geas asks "what's he saying?"  Evidence during the case, including recorded conversations of the defendant, (GX 830-31), conclusively demonstrated that Fusco, whose native language is Italian, spoke broken English.  Like the Geas brothers driving to see Fusco after being approached by Trooper Jones, the reference to Fusco in the middle of a conversation about the recovery of Gary Westerman's body demonstrate the Pavlovian connection in the minds of the Geas brothers between Westerman's murder and Emilio Fusco.  The only reasonable explanation for the strength of this connection is the obvious one offered by Arillotta's testimony and the other evidence: that Fusco helped the Geases and Arillotta murder Westerman.

Fourth, the Government introduced travel records that demonstrated that on April 7, 2010, just two days after the FBI evidence recovery effort began, Fusco booked a flight to Italy leaving in a few days, which he immediately cancelled.  (GX 970).  The next day, however, on April 8, 2010, Fusco booked another ticket to Italy, leaving on April 13, 2010, which Fusco kept and used.  (GX 970; GX 975).  The Government also produced evidence that Fusco took elaborate steps to make it appear that he intended to return to the United States when he flew to Italy (and thus was not fleeing the country based on the Westerman dig), but that in reality were

proven to be false.  Fusco originally booked a round trip ticket and then extended the date of the

return ticket four times, each time extending the ticket for a few weeks, before finally forfeiting

his ticket on July 12, 2010, when he did not show up for his scheduled return flight.  (GX 975).

These return flights were a smokescreen, however, as demonstrated by the fact that on April 19,

five days after he arrived in Italy and a couple of days before his purported first return flight to

the United States was supposed to leave, Fusco booked a round trip ticket from Naples, Italy to

Nantes, France, leaving July 10, 2010 and returning July 18, 2010.  (GX 974).  It is self-evident

that Fusco's repeated extensions of his return-flight were a conscious ruse, as Fusco had already

decided to remain in Italy past the various dates on which he rescheduled his return flight home.

Moreover, as the evidence at trial demonstrated, Fusco's assertion that at least one of the reasons

for the delay of his return flight was because of the volcanoes in Iceland was patently false.  In

fact, the volcanoes in Iceland had no effect whatsoever on any flights on which Fusco was ever

booked.  (GX 976). Both Fusco's hastily planned decision to fly to Italy and his attempts to

obscure the fact that he was fleeing, are compelling, common-sense evidence of Fusco's

consciousness of his participation in the Westerman murder.

Fusco argues that the Government "woefully failed to prove Fusco's participation

in the Westerman murder" because Arillotta is a liar; because it did not make sense for Fusco to

participate in the murder given his relationship with the Geas brothers; because there is no

evidence that corroborates Fusco's participation in the Westerman murder; because Fusco had no

motivation to kill Westerman; and because Fred Geas's account of the murder to Frankie Roche

did not include any reference to Fusco. (Def. Mem. at 7).

With respect to Arillotta's credibility, as discussed above, the evidence at trial

demonstrated that while Arillotta readily lied when he was on the streets committing crimes (as

30

he candidly acknowledged during his testimony), his testimony at trial was credible, truthful, corroborated in myriad ways, and, perhaps most importantly, was corroborated by a multitude of other evidence introduced at trial.  Arillotta's testimony was relied upon in many respects by the jury in both of the trials at which Arillotta testified, including the trial against Fusco where the jury convicted Fusco of three counts principally based on Arillotta's testimony.[18]   More broadly, the FBI was only able to uncover the body of Gary Westerman and charge the perpetrators of that previously unsolved murder *because of* Arillotta's testimony, as it was Arillotta who explained to the Government how Westerman was murdered, where he was buried, and who was involved. Similarly, Arillotta, understanding the vital importance of telling the truth to the Government about all of his criminal activity, further volunteered that he attempted to murder Frank Dadabo, also a previously unsolved attempted murder.  In that crime, Arillotta told the Government and the jury in both trials that he committed this attempted murder with the Geas brothers – and not Emilio Fusco – which was corroborated by the crime scene photos, and hotel and phone records. If, as Fusco contends, Arillotta simply made up Fusco's involvement in the Westerman murder, he no doubt would have had the same motivation to do so with regard to Frank Dadabo.  Instead, knowing the vital importance of telling the truth to the Government and on the witness stand, Arillotta simply recounted his version of these two crimes, of which the Government was previously unaware.[19]

---

[18]     In particular, the jury's guilty verdict on Count Three, the conspiracy to extort James Santaniello, could have only been based on Arillotta's testimony, because, other than limited testimony from Felix Tranghese, Arillotta's testimony was the only evidence on this count.

[19]     Furthermore, the incentive for Arillotta (and Tranghese and Roche) to tell the truth about Emilio Fusco's involvement in the Westerman (and Bruno) murder(s) far outweighs their motivation to falsely implicate Fusco, as each provided substantial assistance relating to Arthur Nigro, the Acting Boss of the Genovese Crime Family, the Geas brothers, who were

Fusco's contention that Fusco would not have agreed to participate in the Westerman murder, either based on the nature of his relationship with the Geas brothers or because he lacked any motivation to kill Westerman, ignores the abundant evidence about the increasing connection between Fusco and Anthony Arillotta's crew, including the Geas brothers, in 2003, as well as the accepted practices of life in the mafia.  Indeed, the evidence at trial revealed that Emilio Fusco was present for the brawl at the Civic Pub in late August; for the drive around Springfield with Arillotta looking for Giuseppe Manzi and his crew after Arillotta's house was shot two nights later; the numerous times Fusco socialized with Arillotta, the Geas brothers, and their crew in late summer and fall of 2003; and Fusco's collaboration with Arillotta and the Geas brothers in planning the Bruno murder, an endeavor that was well under way by the time Fusco was asked to help kill Westerman.  Fusco also ignores the extent to which a willingness to participate in violence when called upon by other members of the Genovese Crime Family was a prerequisite for both membership and advancement in the criminal enterprise.  For example, Anthony Arillotta testified that when, during one of his first trips to meet with Arthur Nigro, he was asked by Nigro to participate in an assault of an individual he did not know, Arillotta agreed without any hesitation, in part because he felt he had no choice but to agree.  (Tr 246-48).  Given Arillotta's status in the Genovese Crime Family in the fall of 2003 as a rising star who was trusted by Arthur Nigro, it is not surprising that Fusco was willing to participate in the Westerman murder when asked by Arillotta.

---

quickly convicted at the previous trials of both murders and the attempted murder of Dadabo, and, in the case of Roche, to Arillotta, who had not yet been charged.  All three cooperating witnesses pleaded guilty to at least one crime that carries a mandatory sentence of life, which would apply if they did not tell the truth and receive a letter from the Government pursuant to U.S.S.G. § 5K1.1.

Fusco's suggestion that there was no corroboration for Arillotta's account of the Westerman murder is plainly contradicted by the evidence described above, which provided extensive support for Arillotta's account. Notably, Fusco ignores many of the more damaging pieces of corroboration, including the meeting with Fred Geas at La Fiorentina on November 10, the Geas brothers reference to the "broken-English guy" while they were discussing the FBI's recovery of Westerman's body, and the crime scene evidence that matched Arillotta's testimony.

Finally, Fusco's reliance on Fred Geas's description of the Westerman murder to Roche as evidence that Fusco did not participate in the murder is misplaced. Between October 2004 and January 2006, while Roche was imprisoned with Fred Geas in Massachusetts, Fred Geas admitted to Roche that "he [Fred Geas], Ty [Geas], and Anthony [Arillotta] had set Gary [Westerman] up as a fake robbery . . . so that they could get him to a certain spot and they'd be able to kill him." (Nigro Trial Tr. 1360).[20] Fred Geas went on to provide a handful of details about the murder, including that "they all had masks on" and that Fred Geas had shot Westerman with a faulty silencer, leading to the bullet bouncing off Westerman's head, which Fred Geas thought was funny. (Nigro Trial Tr. 1360). As Roche's account makes clear, Fred Geas did not purport to provide a complete account of the Westerman murder to Roche. Among the many undisputed facts that Fred Geas did not discuss were the location of the murder, the fact that Westerman was beaten over the head with a shovel, and that Westerman's body was buried in a hole. There are many possible explanations for why Fred Geas may have consciously chosen not to reveal Fusco's role in the Westerman murder to Roche, including Fred Geas's desire to emphasize the primacy of his actions in order to increase his stature in Roche's eyes and the

---

[20]     The trial transcript of Roche's direct testimony regarding his conversation with Fred Geas about the Westerman murder is attached hereto as Exhibit C.

simple fact that while Roche knew Arillotta and both of the Geas brother well, he hardly knew

Emilio Fusco, whose involvement would not have been relevant or important to Roche.  It is also

possible that the failure to mention Fusco's role in the Westerman murder was not a conscious

decision by Fred Geas but instead was an unintentional omission, or that Fred Geas did mention

Emilio Fusco and Roche simply does not remember it.  Whatever the reason behind it, the

significance of Fred Geas's incomplete account of the Westerman murder is minor compared to

all of the other evidence demonstrating Fusco's involvement in the murder.

In sum, the evidence at trial plainly established that Fusco murdered Gary

Westerman on November 4, 2003.  Fusco's participation in the murder was intentional, deliberate

and vicious.  Because Fusco's actions qualify as first degree murder, the offense level for the

Westerman murder is level 43 and the adjusted offense level for this conduct is thus 43.

### 5.    Group Three - Fusco is Responsible for Extortion and Extortion Conspiracies of Over $250,000

Fusco was convicted of conspiring to extort James Santaniello.  In addition,

Fusco's conviction of RICO conspiracy makes him responsible for additional extortions

committed by the Genovese Crime Family in Springfield, between 2001 and 2010, including

numerous other restaurants and bars in Springfield, as well as the extortions of Michael Cimmino,

Carlo and Gerry Sarno, and the attempted extortion of Michael Grant.  Arillotta testified that

while Fusco was in prison, Arillotta, through intermediaries, kept Fusco apprised of all of the

different street rackets being conducted by the Genovese Crime Family, including the various

extortions, that Fusco's family received $1,000 from those rackets, and Fusco relayed his

approval of the Genovese Crime Family's street businesses through the intermediaries.  (Tr. 418-

19).  In addition, once he was released from prison in 2006, Fusco took control of the Springfield

crew's street rackets, including its extortions.  (Tr. 428).  Finally, Fusco started an additional

extortion scheme after his release from prison, a dumpster business which Fusco grew by using

his status in the Genovese Crime Family, along with express threats to secure dumpster accounts

from local business owners.  (Tr. 433-35).  The Government and the Probation Office agree that

the relevant Guidelines provision for Fusco's extortionate conduct is Section 2B3.2, that the base

offense level is 18, pursuant to Section 2B3.2(a), that a two-level enhancement is warranted for

threat of violence, pursuant to Section 2B3.2(b)(1), a three-level enhancement is warranted

because the extortionate conduct exceeded $250,000, pursuant to Section 2B3.2(b)(2) and §

2B3.1(b)(7)(D), and that a two-level enhancement is warranted, pursuant to Section 3B1.1(c),

because Fusco was a leader in the extortionate schemes, resulting in an adjusted offense level of

25.  (PSR ¶¶ 70-76).

       Fusco disputes the enhancements for the offense amount and for leadership,

although he does not articulate any factual basis for his objections.  (Def. Mem. at 3, 21).    The

evidence establishing that the amount of extortionate conduct was over $250,000 was plentiful.

Arillotta testified that the Genovese Crime Family began extorting Santaniello in 2001 and that

Santaniello's weekly payments started at $500 per week but soon rose to $1500 per week, (Tr.

234-36), and then in 2004 to $12,000 per month, (Tr. 383).  Santaniello's monthly extortion

payments of $12,000 per month continued until early 2008, meaning that the extortionate conduct

during from 2004 to 2008 alone was over $450,000.  (Tr. 445).  In addition, Arillotta testified that

by 2002, the total of all the extortions being committed by the Genovese Crime Family (including

the Santaniello extortion) was approximately $12,000 per month, (Tr. 237), and that the

Springfield Crew continued to commit a variety of extortions through 2006 when Fusco came out

of prison and took over that aspect of the Genovese Crime Family's activities in Springfield.  (Tr.

433).[21]

Once he was released from prison in 2006, Fusco served as a leader of the Genovese Crime Family's extortionate schemes in Springfield.  Arillotta testified that when Fusco was released from prison, he took over a number of the rackets on the street and was running the Springfield crew.  (Tr. 428-430; 438).  Fusco demonstrated his control of the Springfield crew by changing the distribution of money from various rackets, including the Santaniello extortion, and by making the decision to stop sending money down to New York. (Tr. 428-31).  In addition, Fusco led a move into the dumpster business, a move that Fusco saw as an opportunity to use his power as the street boss of the Springfield crew of the Genovese Crime Family to force businesses in Springfield to use his new dumpster business.  (Tr. 433-34, 446-48).

In sum, Fusco is properly held responsible for more than $250,000 of extortionate conduct, and for being a leader of the scheme.  The adjusted offense level for the extortion group is thus 25.

### 6.    Group Four - Fusco is Responsible for Loansharking

Although the Probation Office did not determine that a separate group for loansharking was warranted, the Government respectfully submits that loansharking, as a predicate offense for the RICO conspiracy conviction and a type of criminal conduct that was amply proven at trial, should receive a group of its own under Section 2E1.1.  The evidence of Fusco's participation in loansharking included testimony from Anthony Arillotta, (Tr. 199, 423, 428), recordings from 1999 in which Fusco discusses loansharking debts with his customers, (GX

---

[21]    In light of all of the various extortions committed by the Genovese Crime Family in Springfield from 2001 to 2010, Fusco arguably could be held responsible for more than $800,000 in extortionate conduct, which would result in 4-level enhancement pursuant to Section 2B3.1(E).

830-33; GX 830-33T); and the consensual recordings made by Leo Daniele, in which Daniele

money he owes Carmine Manzi, Fusco's partner in his loansharking business, (GX 820; GX 820-

T).

          Fusco's loansharking conduct is governed by Section 2E2.1 of the Guidelines.

The base offense level is 20, pursuant to § 2E2.1(a), and a 2-level enhancement is warranted,

pursuant to § 3B1.1(c), because Fusco was a leader of a loansharking operation that involved

Carmine Manzi and Todd Illingsworth, among others.  The adjusted offense level of Fusco's

loansharking conduct is thus 22.

### 7. Group Five  - Fusco is Responsible for Distributing Over 3,000 Kilograms of Marijuana

          Although Fusco was acquitted on Count Two, the jury found that the Government

had proven Fusco's participation in Racketeering Act Four, which charged a conspiracy to

distribute marijuana between 2001 and February 2010.  The jury was not asked to determine how

much marijuana was involved in the offense.

          The Government and the Probation Office agree that the applicable Guidelines

section is 2D1.1.  The Probation Office determined that the quantity of marijuana involved in the

offense was 50 kilograms, because the charge on which the jury convicted, Title 21, United States

Code, Section 841(b)(1)(D), applies to offenses involving 50 kilograms or less of marijuana,

(PSR ¶ 77), and therefore calculated a base offense level of 20, pursuant to § 2D1.1(c)(10).

          While Fusco was charged with having participated in a conspiracy to distribute

marijuana between 2001 and February 2010, the evidence at trial proved that the marijuana

conspiracy that Fusco participated in began in the early 1990s and continued until at least

February 2010.  The conspiracy was a loose affiliation of members and associates of the

Genovese Crime Family, who distributed marijuana together, despite the "rules" of the Genovese

Crime Family forbidding it members from dealing drugs.  The members of the conspiracy

included Fusco, Arillotta, Tony Capua, Guiseppe Manzi, Chris Berte, Louie Santos, and others.

Arillotta and Fusco's dealings, alone, averaged one hundred pounds of marijuana per month, (Tr.

176), starting in the early 1990s and continuing throughout the 1990s.  (Tr. 175, 177).  Fusco and

Arillotta continued to deal with each other in the early 2000s, though the pace of their dealing

slowed down after Fusco was arrested on charges in the District of Massachusetts, (Tr. 196-97).

One of Fusco's primary partners in the marijuana business was Tony Capua.  (Tr. 194).  Capua

had access to hydroponic marijuana, some of which Arillotta purchased from Capua.  (Tr. 193).

Fusco served as the broker in the marijuana deals between Arillotta and Capua.  (Tr. 193-94).

Fusco continued to distribute marijuana with Tony Capua after he was arrested in the District of

Massachusetts.  (Tr. 198).  While no testimony established with precision how much marijuana

Fusco and the other members of the conspiracy distributed during the charged period, the

evidence at trial revealed that Fusco claimed ownership over approximately 30 pounds of

marijuana that the Geas brothers stole from Tony Capua, (Tr. 270-76), and that Fusco was

moving large amounts of marijuana after his release from prison in 2006 up until Arillotta's arrest

in February 2010 with Capua, Arillotta, and an individual in New Jersey. (Tr. 443-44).

Arillotta testified that Fusco and Arillotta alone dealt an average of one hundred

pounds of marijuana per month together from the early 1990s (conservatively 1993) through the

end of 1990s (1999), a period of seven years.  One hundred pounds of marijuana per month over

seven years results in 8400 pounds or approximately 3818 kilograms.  And the dealing between

Arillotta and Fusco does not measure the full extent of the drug weight attributable to the

conspiracy during the 1990s.  Fusco should also be held responsible for the marijuana distributed

by Capua and the other members of the conspiracy during the same time period.

The 1990s marijuana distribution conduct, which predates the charged time period in the Indictment, is properly considered as relevant conduct, pursuant to Section 1B1.3(a)(1) of the Sentencing Guidelines, which includes all acts by the defendant, Section 1B1.3(a)(1)(A), and in the case of "jointly taken activity," includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly taken criminal activity," Section 1B1.3(a)(1)(B). Both Second Circuit law and the application notes to Section 1B1.3 make clear that in considering relevant conduct, the Court is not limited to considering the conduct that is the basis for the conviction, but instead may consider any acts by the defendant and his co-conspirators, so long as they are part of the same course of conduct as the offense of conviction. *See United States v. Schaper*, 903 F.2d 891, 898 (2d Cir. 1990) ("The Sentencing Guidelines clearly provide [] that a sentencing court must consider a defendant's involvement with quantities of narcotics not charged in the count(s) of conviction, when such conduct was undertaken in the same course of conduct as the offense of conviction."); U.S.S.G. § 1B1.3, Application Note 1 (noting that in determining relevant conduct the focus is on "the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense . . . ."). Application Note 9 to Section 1B1.3 defines a "common scheme or plan" as two offenses that "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." The Second Circuit long ago established the broad nature of relevant conduct in the narcotics context. "[W]e have repeatedly held that quantities and types of narcotics uncharged in the offense of conviction can be included in a defendant's base offense calculation if they were part of the 'same course of conduct' or part of a 'common scheme or

plan' as that offense." *United States v. Perdomo*, 927 F.2d 111, 114 (2d Cir. 1991) (citations omitted). A common scheme "requires a connection among participants and occasions," whereas the same course of conduct "does not require that a connection be established among the drug trafficking occasions in terms of participants or overall plan." *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993).

Where, as here, the earlier marijuana distribution conduct is simply part of the same conspiracy charged in the Indictment,[22] there can be no serious dispute that it is part of the same common scheme or plan as the offense of conviction, and certainly satisfies the more lenient requirements of being part of the same course of conduct. Accordingly, under Section 1B1.3, Fusco's marijuana dealing with Arillotta and others in the 1990s should be considered as relevant conduct. Pursuant to Section 2D1.1(3), more than 3,000 kilograms of marijuana carries a base offense level of 34.

In addition, for several reasons, a 4-level leadership enhancement is warranted pursuant to Section 3E1.1(a). First, Fusco was the only made member of the conspiracy until Arillotta was made in August 2003, which allowed him to stay a step away from the day-to-day dealings while still orchestrating the operation and reaping the benefits of his co-conspirators' dirty work. Second, as demonstrated by Fusco's attempted intervention on behalf of Tony Capua after the Geas brothers robbed Capua of approximately 30 pounds of marijuana, Fusco's status in

---

[22] Because of the doctrine of specialty, which requires that an extradited defendant be tried only for the charges underlying extradition, the Government was unable to supersede against Fusco after Fusco was arrested on July 29, 2010, when extradition proceedings commenced. *See United States* v. *Medina*, 985 F. Supp. 397, 400 (S.D.N.Y. 1997) (determining that the doctrine of specialty "'requires that an extradited defendant be tried for the crimes on which extradition was granted, and none other'") (quoting *United States* v. *Saccocia*, 58 F.3d 754, 766 (1st Cir. 1995)).

Springfield meant that it was Fusco, not the Genovese Crime Family associates with whom he conspired, who had the status to handle high-level discussions on behalf of the conspiracy.  Third, in the late 2000's, it was Fusco who had the significant connection to obtain large quantities of marijuana, while Arillotta, Capua, and others looked for ways to distribute the significant supply of Fusco's.  (Tr. 443-44).

Fusco argues that he should not be held responsible for more than 50 kilograms of marijuana because of factual infirmities in the evidence supporting the accounts of Fusco's distribution of marijuana in the 1990s; because the conduct in the 1990s was not connected to the conduct in the Indictment for which Fusco was convicted; and because the Government is legally estopped from arguing for a greater weight under the Guidelines than that which was charged in the Indictment.  None of Fusco's arguments have merit.

With respect to the infirmities in the Government's evidence, Fusco claims that the Government's claims are based on the uncorroborated testimony of Anthony Arillotta.  For the reasons stated above, Arillotta's trial testimony was reliable and is sufficient by itself to establish the amount that Arillotta and Fusco distributed together in the 1990s.  Fusco also ignores, however, the Leo Daniele recordings, which corroborate several critical pieces of Arillotta's testimony about Fusco's involvement in distributing marijuana, including Arillotta's testimony that Fusco was involved in selling hydroponic marijuana with Tony Capua and that Fusco continued to sell hydroponic marijuana with Capua after he was arrested in the District of Massachusetts case.  (GX 820-23, GX 820-23T).  Fusco also suggests that the evidence of his distribution of marijuana in the 1990s is unavailing because of a claimed contradiction between claims that Fusco distributed marijuana with Tony Capua in the 1990s and the fact that Capua

was born in 1979.[23]   There is no such contradiction.   Anthony Arillotta testified at trial that Tony

Capua and Emilio Fusco dealt marijuana together in the late 1990s and early 2000s, (Tr. 187-88),

when Capua would have been in his late teens or early 20s.   Moreover, according to his criminal

history record, Tony Capua was first arrested in March of 1994 for rape and assault and battery,

and his first marijuana arrest was in April 1997, which further corroborates Arillotta's

testimony.[24]   To the extent that any of the Government's correspondence with the Probation

Office was imprecise in identifying the specific time period in which the evidence showed Capua

and Fusco distributed marijuana together, it has no bearing on the factual determinations the

Court must make regarding the amount of marijuana Fusco is responsible for distributing.

With respect to Fusco's claim that there is no evidence connecting Fusco's

marijuana dealing in the 1990s with his marijuana dealing in the 2000s, Fusco simply ignores the

trial evidence.   As detailed above, Arillotta testified that Fusco's distributed marijuana with the

same set of individuals in the 1990s, the early 2000s (albeit in smaller amounts), and again in

mid-to-late 2000s, after Fusco was released form prison.

Fusco claims that the Government should be prevented from seeking to hold him

responsible for over 50 kilograms of marijuana on a theory of estoppel or forfeiture.   Not

surprisingly, Fusco fails to cite a single case to support this novel legal proposition.   In fact, it is

well-settled in the Second Circuit that the fact that "drug quantity is an element of a § 841 offense

does not preclude a district court from considering drug quantity for sentencing purposes . . . in

---

[23]     In the course of its correspondence with the Probation Office, the Government
erroneously suggested that Capua was born in 1971 based on a law enforcement database
that lists a Tony Capua with a birth year of 1971.

[24]     A redacted version of Tony Capua criminal history is attached hereto as Exhibit D.

cases where quantity is not charged in the indictment or found by the jury, so long as the resulting sentenced does not exceed the statutory maximum." *United States* v. *Thomas*, 274 F.3d 655, 663-64 (2d Cir. 2001); *United States* v. *Gonzalez*, 420 F.3d  F.3d 111, 123, 131 (2d Cir. 2005).  Here, where the sole issue is the calculation of Fusco's guidelines, and not any change in the statutory maximum sentence, there is no basis to limit the offense conduct level for Fusco's marijuana trafficking.

Finally, Fusco argues that an enhancement for leadership is not warranted here, but fails to explain why Fusco's status as the only made member in the conspiracy did not confer a leadership role.  In fact, as described above, the evidence established that Fusco did use his status as a made member of the Genovese Family as a source of authority during the course of his marijuana dealing.  For instance, when the Geas brothers robbed Tony Capua of marijuana in 2003, it was Fusco who went to the Geas brother and said that the marijuana that they had robbed was his and that they had to pay it back.  (Tr. 271-72).  The reaction of the Geas brothers made clear that Fusco's authority to deal with the situation came from his status in the Genovese Crime Family; instead of confronting Fusco directly, the Geas brother went to Adolfo Bruno, then the capo of the Springfield Crew, to tell Bruno about the situation, (Tr. 272), knowing that Fusco's involvement in drug dealing would be frowned upon by Bruno.

In sum, the evidence at trial established that Fusco is responsible for distributing over 3000 kilograms of marijuana and was a leader of a marijuana distribution conspiracy involving five or members.  The adjusted offense level of Fusco's marijuana distribution activities is thus 38.

### 8.    Group Six  - Fusco is Responsible for Illegal Gambling

As was the case with loansharking, although the Probation Office did not

determine that a separate group for illegal gambling was warranted, the Government respectfully submits that because illegal gambling was a predicate offense for the RICO conspiracy conviction and a type of criminal conduct that was amply proven at trial, a separate group for illegal gambling should be applied.  The evidence of Fusco's participation in illegal gambling included testimony from Anthony Arillotta and Felix Tranghese, (Tr. 163-65, 212-13, 439-41, 1115-16), recorded phone conversations involving Fusco in 1999 and 2000, (GX 830, 839; GX 830T, 839T), and a text message on a cellphone that Fusco was carrying when he was arrested, (GX 865; GX 865T).  Fusco's illegal gambling conduct is governed by Section 2E3.1 of the Guidelines, the base offense level is 12, pursuant to Section 2E3.1(a)(1), and a four-level enhancement for leadership is warranted, pursuant to Section 3B1.1(a), because Fusco was at various times the leader of a numbers operation that involved more than five employees.  (Tr. 212-13, 439-41).  The adjusted offense level for Fusco's illegal gambling conduct is thus 16.

### 9.　　Grouping Analysis

Applying the grouping analysis set forth in Section 3D1.4, Group One, the murder of Adolfo Bruno has an adjusted offense level of 43, and comprises one Unit.  Group Two, the murder of Gary Westerman, also has an adjusted offense level of 43, and adds one Unit.  Group Five, the marijuana distribution, has an adjusted offense level of 38, and comprises a half Unit, pursuant to U.S.S.G. § 3D1.4(b), because Group Five is between five and eight levels less serious than Group One.  Groups Three, Four, and Six are disregarded because they are nine or more levels less serious than Group One.  Because there are a total of two-and-one-half Units, the offense level of the highest group is increased three levels, pursuant to U.S.S.G. § 3D1.4, resulting in a combined offense level of 46.

### 10.　　The Government is not pursuing a Guidelines Enhancement for

44

### Obstruction of Justice

The Government had initially sought an enhancement for obstruction of justice based on statements by Fusco's counsel in connection with his bail hearing on July 26, 2011. First, in advance of the hearing, Fusco's counsel submitted an affirmation that was clearly based on information from Fusco that addressed the reasons why Fusco flew to Italy on April 13, 2010, and why he remained in Italy until his arrest.   Then, during the bail hearing on July 26, 2011, Fusco's counsel consulted repeatedly with Fusco while answering questions from the Court about the reasons for Fusco's trip.   As demonstrated at trial, the explanations in the affidavit and in the statements by Fusco's counsel at the hearing were patently false.   Fusco's flight records make clear that Fusco always intended to stay in Italy until at least July, and probably permanently, and his repeated assertions that his trip was extended by family illness, volcanos in Iceland, and finally by business dealings, were simply untrue.

Upon further reflection, however, because Fusco did not speak on the record at the bail hearing and did not file an affirmation himself, the Government no longer seeks an enhancement for obstruction of justice.   Instead, the Government asks that the Court consider Fusco's role in his counsel's affirmation and statements in fashioning an appropriate sentence, in addition to the fact of his flight from prosecution.

### 11.    Total Offense Level and Guidelines Range

Based on the foregoing, Fusco's total offense level is 46.   The parties and the Probation Office agree that Fusco has five criminal history points and is in Criminal History Category III.   At offense level 46 and Criminal History Category III, the recommended Guidelines range is life imprisonment.   Pursuant to Section 5G1.1 of the Guidelines, where, as here, the highest total maximum sentence (20 years) is less than the total punishment, "the

sentence imposed on one or more of the other counts shall run consecutively . . . to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.1(d). In order to produce a combined sentence that is as close as possible to the recommended total punishment, the Court should impose the maximum sentence on each of the three counts of conviction, resulting in a sentence of 45 years' imprisonment.

**B.      A Sentence of 45 years' Imprisonment is Appropriate and Necessary**

A sentence of 45 years' imprisonment is the only appropriate and sufficient sentence available to the Court to adequately provide just punishment for Fusco's violent and heinous crimes; to specifically deter Fusco, an unrepentant criminal; to generally deter others from committing similar crimes, particularly membership and involvement in the mafia; and to avoid unwarranted disparities with Fusco's co-defendants and other similar defendants around the country.  The perniciousness of Fusco's conduct, his dedication to a destructive criminal organization, and his failure to be deterred by his past term of incarceration, all demonstrate that the maximum prison term allowable is necessary in this case.

**1.      Nature and Circumstances of the Offense and Characteristics of the Defendant**

Emilio Fusco both set in motion the events that led to the murder of Adolfo Bruno and also helped to plan and execute the murder plot.[25]  Fusco also murdered Gary Westerman, laying in wait for Westerman to arrive at Joe Iellamo's house before he bashed Westerman's head in with a shovel and then buried his body in the woods.  In addition, Fusco participated in

---

[25]      It is worth noting that at the same time Fusco adamantly refused to acknowledge his membership in the Genovese Crime Family, prompting the publication of the addendum that instigated Bruno's murder, Fusco was promoting the Genovese Crime Family's rules by planning and execute the murder of Al Bruno at the direction of his superiors.

significant crimes of extortion, loansharking and illegal gambling as a soldier in the Genovese

Crime Family, and he distributed massive amounts of marijuana with Genovese Crime Family

associates.  There can hardly be a clearer case where the nature and circumstances of the offense

require serious punishment.

There are no mitigating factors applicable to the murders here.  Fusco did not act

on the spur of the moment, without a chance for reflection.  Nor did Fusco act under any

mitigating factors such as partial duress, mental incapacity, or imperfect self-defense.  The

murders he committed – while under court supervision awaiting his surrender for a 33-month

sentence – were calculated and carefully planned.  Moreover, Fusco participated in the murders as

a dutiful soldier in the mafia in order to promote and protect his own standing in the criminal

enterprise.

Nor is there anything in the personal characteristics of the defendant that counsels

for a sentence of less than 45 years' imprisonment.[26]  Fusco has devoted his adult life to working

for the mob, committing crimes for a living as a manipulative, professional criminal.  His

previous conviction for racketeering in the District of Massachusetts reflects his pervasive

devotion to a life of crime, a life of crime that continued throughout his prior case until today.

---

[26]     Fusco's submission, which devotes far fewer words to the actual consideration of the
Section 3553(a) factors than it does to its lengthy exposition on the undisputed principles of
sentencing law, argues that Fusco should be sentenced to a below-Guidelines sentence
because he is the man depicted in the letters submitted to the Court and not the man depicted
by the evidence at trial.  (Def. Mem. at 27).  This argument is remarkable for its to failure to
seriously contend with Fusco's criminal conduct and ongoing participation in the Genovese
Crime Family.  Similarly, the letters from Fusco's family uniformly fail to even acknowledge
Fusco's previous conviction, his conduct in this case, or his life-long participation in
organized crime. Besides offering an incomplete picture of Fusco, the letters raise the
question of whether Fusco's friends and family will play any role in helping prevent him
from reverting to a life of crime if and when he is released from prison.

Fusco has consciously chosen this course for himself.  He has chosen to be a criminal, and he has chosen to kill.

**2.  Need For Sentence to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

A sentence of 45 years' imprisonment is necessary to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment.

While the seriousness of Fusco's conduct is reflected in the Guidelines recommendation of life imprisonment, the recommended Guidelines sentence does not properly capture the extent of Fusco's criminal conduct.  Either of the two murders, standing alone, would have warranted an offense level of 43 and a Guidelines sentence of life.  Further, even if the murders were not considered, Fusco's additional conduct over the course of nearly two decades would warrant a Guidelines level of 38 based on Fusco's extensive marijuana distribution activities, and would result in a recommend Sentencing Guidelines range of 295-362 months.  Yet even this analysis does not account for Fusco's decades-long involvement in multiple extortions, loansharking, and illegal gambling with the Genovese Crime Family, as these crimes all drop out of the Guidelines calculation under the grouping analysis.  As a result, the sentencing range of 295-362 months' imprisonment fails to fully capture the extent and seriousness of Fusco's criminality.

Moreover, each of Fusco's crimes must not be viewed in a vacuum.  They were all committed with, and for, the Genovese Crime Family of La Cosa Nostra, a criminal enterprise dedicated to the commission of crimes to enrich its members through fear, intimidation and violence.  Members of the mafia, like Emilio Fusco, have sworn to a set of rules that trump their families and the rule of law.  Indeed, those who take the oath of the mob commit themselves to a

48

life of crime predicated on disrupting the orderly operation of this country, a nation built on the rule of law.  To members of the mafia, violence and intimidation is a regular part of daily life, as crimes of violence such as murder, assault, extortion, and loansharking are the common thread that binds mobsters together.  And if one dares to violate the cardinal rule by cooperating with law enforcement, they are killed, just as Adolfo Bruno and Gary Westerman were because they were believed to be "rats."  Emilio Fusco stands before this Court at sentencing as an unrepentant soldier in the Genovese Crime Family.  He has not renounced his membership in any way.  He is a perfect example of the devastation and destruction the mafia causes.  There is no more serious offense than murder; there is no institution that disrespects the law like the mafia; and there is therefore no just punishment in this case less than the statutory maximum sentence available to the Court.

### 3.  Need for Adequate Deterrence and Need to Protect the Public

There is an essential need for both specific and general deterrence in this case. With respect to specific deterrence, Emilio Fusco has demonstrated an resolute inability to be deterred from his life of crime.  As the Court knows, Fusco was convicted of racketeering conspiracy and money laundering arising out of similar criminal conduct underlying some of the charges in this case.  Yet the felony convictions and the subsequent term of 33-months' imprisonment did absolutely nothing to change Fusco's criminal ways.  In fact, the evidence at trial revealed that, as soon as he was released from prison, Fusco returned with a vengeance to his life of crime with and for the Genovese Crime Family, immediately vaulting himself to be the street boss of the Springfield crew.  Moreover, for nearly the entire period of the charged racketeering conspiracy for which he was convicted, Fusco was under some sort of court supervision or term of incarceration, yet his criminal activity never ceased, and included the

murders of Gary Westerman and Adolfo Bruno.

Moreover, Fusco has shown no acceptance of responsibility or remorse for his conduct. Nor has Fusco ever simply acknowledged his vicious acts to any of the victims, or the victims' families.[27] Again, a life sentence is recommended by the Guidelines and a 45-year sentence, the maximum allowable, is necessary and appropriate given Fusco's pervasive devotion to a life of crime, his lack of remorse, and his demonstrated ability and intention to continue to commit crimes while under court supervision and even in prison. There is nothing to suggest that Fusco will not follow the same path after he is sentenced in this case. A sentence of 45 years' imprisonment is therefore warranted to protect the public from Fusco returning to the streets and resuming his life of crime.

In addition, a sentence of 45 years' imprisonment is necessary to provide general deterrence to other professional criminals who have devoted themselves to a life in the mob, in which crimes of violence are a daily ritual. A serious punishment is necessary to warn others about the consequences of joining the mafia, following its rules, and committing crimes on its behalf. As the Court observed during the sentencing of Arthur Nigro, Fred Geas, and Ty Geas, "if you engage in the most serious of crimes the penalty is not one where you go off and do six to twelve years or even 20 years and then you get out and then you do something else with your life. We hope that sentencing deters other from going down this path . . . ." (Sept. 12, 2011 Tr. 40).

Finally, there is a significant and obvious need to protect the public from Emilio Fusco, whose crimes not only span nearly two decades but include crimes of violence and the

---

[27]     The Government has notified all of the victims, and their surviving family members, of the sentencing proceeding. The Government currently does not expect any victims to opt to address the Court.

persistent and repeated threats of violence.  As the Court stressed when sentencing Fusco's co-defendants last September, the need to protect the public from future crimes of the defendant is significant, noting with Arthur Nigro, in particular, that there was no indication that he had renounced his membership in the Genovese Crime Family. (Sept. 12, 2011 Tr. at 40).

### 4.   Need to Avoid Unwarranted Sentence Disparities with Similarly Situated Defendants

A sentence of 45 years' imprisonment is also necessary to avoid an unwarranted disparity between the sentence imposed on Fusco and the sentence imposed on Fusco's co-conspirators Arthur Nigro, Ty Geas, and Fred Geas, who were all sentenced to terms of life imprisonment in connection with their participation in the crimes that they committed with Fusco.  In sentencing Nigro and the Geas brothers, the Court made clear that while it was required by statute to impose a sentence of life imprisonment, a sentence of life was also the just sentence given the nature of the conduct:

> Society has dictated the penalties for crimes that resulted in murder of individuals and society, as expressed through the national legislature, signed into law, has determined that that has a mandatory sentence.  In our federal system there is no parole so a sentence of life is sentence of life without parole.  In this case it's deserved.  Society is not wrong in saying that that is the penalty.  There were no extenuating or mitigating circumstances that I can see in this case and there was plenty of opportunity to think about the actions.

(Sept. 12, 2011 Tr. 39).

All of the same considerations that warranted a sentence of life imprisonment for Nigro and the Geas brothers apply with equal force to Fusco.  Fusco's participation in the murders was similarly deliberate, and the considerations of just punishment, protecting the public, and deterring others are just as present with respect to Fusco as his co-conspirators.  As was also

51

true with his co-defendants, there is no evidence of any mitigating factors that would counsel for a lower sentence.  Moreover, in sentencing Nigro and the Geas brothers, the Court did not merely impose a life sentence on the murder charges that carried a mandatory sentence of life imprisonment, but also imposed the statutory maximum sentences on other counts of conviction, including a sentence of 20 years on Count Six, the same conspiracy to extort James Santaniello for which Fusco was also convicted.  (Sept. 12, 2011 Tr. 40-41).  For the reasons stated above, it would create an unwarranted disparity to sentence Fusco's co-conspirators to 20 years on the Santaniello extortion but to sentence Fusco to less than that.  To the extent that Fusco is differently situated from his co-conspirators based on the jury's decision not to convict Fusco on the murders, Fusco has already reaped the benefit of that decision because he faces a maximum term of imprisonment of 45 years' imprisonment, and not life.

Finally, a sentence of 45 years' imprisonment is warranted to avoid disparities with similarly situated individuals nationwide.[28]  There is no reason to conclude that Fusco is less culpable than other individuals who commit first-degree murders nationwide, most of whom are sentenced to life.   Moreover, Fusco is more culpable than many others convicted of murder because he is responsible for two murders, in addition to a laundry list of other serious crimes.

---

[28]    While Fusco spends more of his sentencing memorandum summarizing statistical analyses of sentences imposed in this District than he does addressing the sentencing factors under Section 3553(a), (Def. Mem. at 25-26), he fails to explain how this *ex post*, descriptive analysis has any bearing on the sentencing factors in this particular case.  Unquestionably, the statistics Fusco presents say nothing about the nature and circumstances of the offenses or any personal characteristics about Fusco, nor do they have any bearing on the kinds of sentences available for the particular crimes committed by Fusco.  Nor do the statistics Fusco cites reflect upon possible unwarranted disparities between similarly situated co-defendants. Even assuming that the statistical analysis cited is somehow relevant to a court's imposition of a sentence, the facts of this case are markedly different from the average case in the Southern District of New York (if such a case exists) and those facts counsel for the maximum possible sentence, for the reasons stated above.

In sum, the criminal conduct that Fusco engaged in was staggering in scope, longevity and seriousness, and would support a sentence of more than 45 years' imprisonment if the Court were allowed.  The Government therefore respectfully submits that a sentence of 45 years' imprisonment is the only sentence that satisfies the purposes of sentencing in this case.

## C.      Forfeiture

The Government also seeks a forfeiture order of $260,000, including a judgment for the following specific property seized from Fusco at the time of his arrest: $6000 and 7500 euros (roughly equivalent to $9,675).  The $260,000 figure is based on the trial testimony about certain specific criminal proceeds that Fusco received in the course of the charged crimes, giving Fusco every benefit of the doubt regarding timing and amounts.[29]  The Government recognizes that Fusco will have little to no earning capacity while imprisoned; nonetheless, the Government requests that the Court order that a percentage of Fusco's UNICOR earnings while working in prison be allocated to forfeiture.  The Government will forward a proposed forfeiture order to the Court before sentencing.

---

[29]      See Tr. 238 (Fusco receiving $600 per month from extortions in 2001 and 2002); Tr. 417 (Arillotta giving Fusco $1000 per week in 2004 and 2005 in proceeds from various rackets); Tr. 421 (Arillotta gives Fusco extra payments of $3,000 and $5,000 in 2004); Tr. 423 (Arillotta collecting $2,500 in loansharking proceeds every two week for Fusco from Frank Zimmitti in 2004 and 2005); Tr. 433 (according to Fred Geas, Fusco receiving $2000 per month from Santaniello extortion in 2007).

## **CONCLUSION**

For the reasons stated above, the Government respectfully requests that the

defendant Emilio Fusco be sentenced to term of 45 years' imprisonment and ordered to pay

$260,000 in forfeiture.

Dated:  New York, New York
        October 3, 2012

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney

                    By: _____/s/_____
                        Daniel S. Goldman
                        Nicholas L. McQuaid
                        Assistant United States Attorneys
                        Tel. No.: (212) 637-2289/1049


cc: Richard Lind, Esq., (By ECF)