UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------   x

UNITED STATES OF AMERICA                                         :

    - against -                                              :

                                                     Ind. 09 Cr. 1239 (PKC)

EMILIO FUSCO,                                                    :

                 Defendant.                                :

---------------------------------------------------------------   x

## DEFENDANT EMILIO FUSCO'S MOTION FOR COMPASSIONATE RELEASE

       Pursuant to the Coronavirus Aid Relief and Economic Security Act enacted on March 27, 2020 (hereinafter referred to as the "CARES Act"), and the First Step Act of 2018, the defendant, EMILIO FUSCO, through his counsel, Camille M. Abate, Esq. hereby moves for a reduction in sentence due to the life-threatening situation created by the coronavirus pandemic (COVID-19). Specifically, after serving 122 months of a 300-month sentence, Mr. Fusco moves to convert the remaining 178 months to a period of home confinement, or to reduce his sentence to a period of 122 months (time served) followed by supervised release. In the alternative, Mr. Fusco seeks a recommendation from the Court to the United States Bureau of Prisons ("BOP") that he be temporarily released pursuant to 18 U.S.C. § 3622, until the life-threatening situation created by the coronavirus pandemic is alleviated through the creation and administration of a vaccine.

<u>Background</u>

       Emilio Fusco went to trial in 2012 on an indictment that charged the following counts: (1) racketeering conspiracy in violation of 18 U.S.C. § 1962(d); (2) racketeering in violation of

18 U.S.C. § 1962(c); (3) extortion conspiracy in violation of 18 U.S.C. § 1951; (4) extortion in violation of 18 U.S.C. § 1951; and (5) interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952.

The jury acquitted him on Count 2, the substantive Racketeer Influenced and Corrupt Organizations Act ("RICO") charge, finding that the Government had not proven his guilt with respect to the predicate acts of murder and conspiracy to murder Adolfo Bruno and Gary Westerman, pursuant to 18 U.S.C. §1512, or extortion and conspiracy to extort James Santaniello, pursuant to 18 U.S.C. § 1962(c). The jury also acquitted Mr. Fusco of Count 4, extortionate extensions of credit and using extortionate means to collect under 18 U.S.C. §§ 892 and 894, pursuant to 18 U.S.C. § 1951.

Fusco was convicted of violating the conspiracies charged in Count 1 (racketeering conspiracy) and Count 3 (extortion conspiracy), as well as Count 5 (substantive count charging interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952). The Presentence Report ("PSR") analyzed the convictions pursuant to the United States Sentencing Guidelines ("USSG") edition of November 1, 2011. After grouping the convictions in two groups (extortion conspiracy and narcotics trafficking), the probation department arrived at an Offense Level of 26 with a Criminal History Category of III, resulting in a guidelines range of 78-97 months. *See* PSR, ¶ 141.

Under this analysis, Mr. Fusco's 10+ years of incarceration has already exceeded the time computed under the USSG by the probation department. However, the Court adopted the government's analysis, which contended that the Court should apply USSG guideline 2A1.1, the guideline for first degree murder, because Mr. Fusco's actual and relevant conduct involved the murders of Adolfo Bruno and Gary Westerman. The Court found that the acquitted conduct was

proved by a preponderance of the evidence,[1] and sentenced the defendant to a period of 300 months, for a total of 25 years.

Prior to his incarceration, at the time of sentencing (before he was remanded into custody), his health was relatively stable, with his irregular heartbeat, shortness of breath, and other issues controlled by continued visits to heart specialists and doctors. PSR ¶ 118. Since his incarceration, however, his health has dramatically declined. Mr. Fusco is now 52 years old. As discussed below, his health situation has become dire, and there are extraordinary and compelling circumstances that warrant compassionate release.

Mr. Fusco has exhausted his administrative remedies, as required by 18 U.S.C. § 3583(c)(1)(a).[2] He submitted an administrative request for compassionate release to FMC Devens on May 7, 2020. On June 6, 2020, his request was denied. On June 17, 2020, Mr. Fusco filed an administrative appeal of that denial; on July 13, 2020, his request was denied. On July 18, 2020, Fusco filed a BP-10 to which he never received a response. On August 7, 2020, Mr. Fusco wrote letter a to Warden Spaulding, again making an administrative request for compassionate release. To date, he has received no response. *See* FMC Devens Compassionate Release Notification Forms dated 5/29/20, 6/2/20, and 7/13/20, as well as Mr. Fusco's letter to the Warden dated 8/7/20, together attached as Exhibit A.

At a COVID-19 hearing held on May 13, 2020, with Warden Spaulding in *United States v. Pena*, 16-Cr-10236-MLW (D.Mass), the warden testified that for any inmate who files a

---

[1] Sentencing transcript of October 11, 2012, pp. 83-85. There is currently a bill pending in the Senate, S. 2566, introduced on September 26, 2019, entitled the "Prohibiting Punishment of Acquitted Conduct Act of 2019" to amend 18 U.S.C. § 3661 to prohibit consideration of acquitted conduct to enhance a sentence.

[2] Through the First Step Act, enacted December 21, 2018, Congress allowed defendants to directly petition courts for relief, rather than leaving that power solely to the hands of the BOP. See 18 U.S.C. 3582(c)(1)(A). "[U]nder the amended statute, a court may conduct such a review also 'upon motion of the defendant,' if the defendant has exhausted all administrative remedies to appeal to the BOP's failure to bring a motion, or if 30 days has lapsed 'from the receipt of such a request by the warden of the defendant's facility,' whichever is earlier." *United States v. Haney*, 2020 WL1821988 (SDNY 2020)(finding that the thirty-day waiting period is waivable).

compassionate release application, he does not give any consideration to medical concerns

arising from the current pandemic:

> COURT: Let me ask you this: So am I right in understanding that you felt because, you know, Mr. Pena -- you know, essentially you made the decision with regard to the request for reduction in sentence based on the same criteria that you would have before the pandemic; is that right?
> WARDEN SPAULDING: Yes, sir.
> THE COURT: And you didn't consider, for the purpose of that motion, whether the COVID-19 pandemic constituted extraordinary and compelling circumstances that would justify release?
> WARDEN SPAULDING: No, sir. (Transcript of Spaulding testimony, 30/25-31/10)

> \*\*\*

> THE COURT: Am I -- okay. So with regard to the reduction in sentence, I think you just told me this, you denied that request in April because the guidance – the requirements set forth in CFR Section 5050.50 weren't met, correct?
> WARDEN SPAULDING: Yes, sir. (Tr. 32/9-14)

> \*\*\*

> MR. KATZ: Warden, do you remember Judge Wolf was asking you some questions about the criteria you considered in assessing Mr. Pena's compassionate release request?
> WARDEN SPAULDING: Yes, sir.
> MR. KATZ: And I understood you to say that you did not consider the current pandemic in evaluating that request. Is that correct?
> WARDEN SPAULDING: That's correct.
> MR. KATZ: *So is that true for all inmates who submit a compassionate release request at FMC Devens?*
> WARDEN SPAULDING: *Yes, sir.*
> MR. KATZ: Do you know whether or not that's – has the Bureau of Prisons or the Department of Justice offered any guidance on that?
> WARDEN SPAULDING: They said to not use COVID-19 as a sole determination of reduction in sentence or compassionate release.
> MR. KATZ: Okay. But so it can be considered? It just can't be the sole determination?
> WARDEN SPAULDING: *I don't consider COVID-19 as part of the criteria for reduction of sentence or compassionate release based on the 5050.50 program statement.*
> MR. KATZ: And, again, is that based on guidance you've been given from the Department of Justice or the Bureau of Prisons, or is that just your reading of what 5050.50 requires?

WARDEN SPAULDING: No, sir. It's based on guidance from central office. (Tr. 42/18-43/21)(Emphasis added.)

Based upon Warden Spaulding's testimony, this Court should give no weight to the rejection of Mr. Fusco's application for compassionate release by the warden.

<u>Extraordinary and Compelling Reasons Favor Compassionate Release</u>

Under 18 U.S.C. § 3582(c)(1)(A), the Court "may reduce the term of imprisonment, after consideration of the factors set forth in § 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction." Courts have turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. As provided in section 1B1.13, consistent with the statutory directive in § 3582(c)(1)(A), the compassionate release analysis requires that a court address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A). Second, the Court must determine whether the defendant is "a danger to the safety of any other person or to the community…." U.S.S.G. § 1B1.13(2). Finally, the Court must consider factors identified in 18 U.S.C. § 3553(a), "to the extent they are applicable." U.S.S.G. § 1B1.13.

The Application Notes to section 1B1.13 provide, in part:

1. **Extraordinary and Compelling Reasons**.—... [E]xtraordinary and compelling reasons exist under any of the circumstances set forth below:
(A) **Medical Condition of the Defendant**.—
(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—
(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care

within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

COVID-19 has spread to all parts of the United States, including its prisons. There is currently no vaccine or cure for this deadly disease. The CDC has said that the following groups of people are at a higher risk of severe illness from COVID-19:

- People aged 65 years and older
- People of all ages with underlying medical conditions, particularly if not well controlled, including:
  - People with chronic lung disease or moderate to severe asthma
  - *People who have serious heart conditions*
  - *People who are immunocompromised*
  - People with severe obesity
  - People with diabetes
  - People with chronic kidney disease undergoing dialysis
  - People with liver disease

Centers for Disease Control and Prevention, Coronavirus Disease 2019: *People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html. (Emphasis added.)

Emilio Fusco, at 52 years old, stands at a dangerously high risk of contracting the virus. First, Mr. Fusco is severely immunocompromised; he suffers from neutropenia, defined as an abnormally low count of neutrophils, a type of white blood cell. *See* Bureau of Prisons Health Services Note (diagnosing neutropenia), dated 9/27/2013, and hematology reports showing consistently low levels of WBC (White Blood Cells) and Neutrophils from 2013, 2014, 2017, and 2018, attached as Exhibit B. According to the American Academy of Allergy, Asthma, and Immunology (the "AAAAI"), neutrophils are "an important white blood cell that fights

infections."[3] Neutropenia exposes Mr. Fusco to a much more severe risk of not only contracting COVID-19, but dying from it, due to his body's compromised ability to fight infection.

Second, Mr. Fusco has a serious heart condition: in June 2008, he was hospitalized and underwent heart surgery at Baystate Medical Center in Springfield, MA. See Cardiac Electrophysiology Report dated 6/26/2008, attached as Exhibit C. During the six years that he has been in FMC Devens, Mr. Fusco has repeatedly suffered from severe chest pain. In 2017, he was taken to a nearby facility in Boston, MA, where they ran medical tests of his heart. He continues to report shortness of breath. Thus, the heart condition persists in a chronic condition, causing Mr. Fusco both shortness of breath and chest pain.

Finally, although Mr. Fusco is not chronologically over 65 years old, according to medical professionals who deal with inmate populations, "prisoners' physiological age averages *10 to 15 years older* than their chronological age." *See* the Affidavit of Brie Williams, MD, attached hereto as Exhibit D, ¶ 12, and authorities cited therein. (Emphasis in original.) This circumstance places him within the CDC's critical danger zone of persons 65 years of age and older.

Due to his grave, chronic medical issues, for the past six years Mr. Fusco has been housed in a high medical risk federal facility, FMC Devens. The Federal Medical Center at Devens, Massachusetts, is a United States federal prison for male inmates requiring specialized or long-term medical or mental health care. However, FMC Devens has not escaped the ravages of the coronavirus. To the contrary, according to statistics available on the Bureau of Prisons website as of September 8, 2020, two inmate deaths have been attributed to the virus, two inmates and one staff member are currently positive for COVID-19, and 47 inmates and six staff

---

[3] Aaaai.org/conditions-and-treatments/conditions-dictionary/Neutropenia.

members have recovered from the virus. On May 15, 2020, in response to calls and concerns

voiced by affected inmates and family members, Massachusetts Senators Elizabeth Warren and

Edward J. Markey, and Representative Lori Trahan wrote to Michael Carvajal, the Director of

the Federal Bureau of Prisons in Washington, DC, in order to urge corrective action for FMC

Devens. "In Massachusetts, there have been over 80,000 confirmed cases of COVID-19 and over

5,400 deaths…. By design, FMC Devens holds individuals who need specialized medical care—

individuals who may be at higher risk of serious illness if they contract COVID-19. These

individuals should be prime candidates for home confinement." *See* letter of May 15, 2020,

attached as Exhibit E.

The conditions of confinement at FMC Devens create an optimal environment for the

transmission of this seriously contagious disease. [4]  Because of this, home confinement is

especially important for Emilio Fusco, who is already within the "high risk" category of

contracting the virus and dying due to his age, his immunocompromised state, and his serious

heart condition.

In FMC Devens, the prisoners share four common telephones, five common computers,

and two televisions, all of which are clustered close together. These devices are not cleaned or

disinfected after each prisoner uses them.[5] Hand sanitizer, and any effective disinfectant

recommended by the CDC to reduce transmission rates, is contraband in jails and prisons

because of its alcohol content.

---

[4] Prisons in general are rife with opportunities to spread the virus; staff leave the facility and return daily; people deliver supplies to the facility; inmates have medical visits outside of the facility. *See* Exhibit D, the Affidavit of Brie Williams, MD ¶¶ 5-7.
[5] Additionally, these devices, clustered as they are, cause many verbal and physical fights. The BOP is either unable or unwilling to replace broken or damaged devices for the units, creating more disputes due to shortages. When these fights occur, the guilty parties are taken off the block as per administrative policy; however, the rest of the unit is left on a lock-down status. Inmates are locked in the cell for days, compounding the issue of clutter.

In addition, because of the BOP officers' lack of respect for inmates' personal space and/or boundaries (i.e., officers routinely refuse to wear or to allow inmates to wear masks, refuse to sanitize high-touch areas with sprays, refuse to wear or provide gloves) inmates are placed at a much higher risk of contracting the COVID-19 virus. This is true not only for the common devices for communication and entertainment, but in the dining areas as well. The prisoners stand close together while waiting in line to be served a meal. They eat together in a common area at communal tables. These high-density areas are precisely the kind of space that have caused the alarmingly high-spread rates of COVID-19 in prison.

Further, living in tight, dorm-like quarters do not permit the six feet of social distancing recommended by the CDC. Mr. Fusco shares a cell with another inmate, Walter Dominguez (Reg. #62613-112). Their bunk beds do not afford six feet of space between them. Moreover, cell mate Dominguez goes to dialysis treatment three times a week, where he has contact with other inmates from different units, all of whom have chronic bleeding issues that create a greater risk of infection. The sharing of unsanitary bathroom facilities exacerbates the extraordinary contagion.

Thus, the conditions of confinement at FMC Devens create an optimal environment for the transmission of contagious disease. Mr. Fusco remains in imminent danger of infection, illness, and death from COVID-19. His immunocompromised condition dramatically increases the risk that he contract the virus, and once contracted, his immune system likely would not be able to fight the infection; combined with his heart issues, this would turn his prison term into a death sentence. Two inmates have already died at FMC Devens. Therefore, Emilio Fusco's current health condition creates a high co-morbidity potential due to COVID-19.

The Court has a duty to protect inmates such as Emilio Fusco from the "terminal illness" of the virus. Mr. Fusco has served 122 months, approximately 48 percent of his 300-month sentence. Mr. Fusco's BOP record of conduct is exemplary and contains no violent or disruptive incidents. The unforeseen circumstances of the current pandemic have increased the severity of Emilio Fusco's punishment and justify a reduction in his sentence.

Due to the COVID-19 pandemic, this Court has the authority to reduce the sentence and apply a term of supervised release, including the unserved portion of the original sentence, with or without conditions. *See*, *e.g.*, *United States v. Hector Morales*, 2020 WL 5369198 (D.Conn, Sept. 8, 2020)(court reduced sentence of defendant who served 97 months of 135 month sentence to time served); *United States v. Rivernider*, 2020 WL 2393959 (D.Conn. May 12, 2020)(court reduced sentence of defendant who served 50% of 144 month sentence to six months of home confinement followed by supervised release); *United States v. Delgado*, 2020 WL 2464685 (D. Conn. Apr. 30, 2020) (reducing 120-month sentence to 29 months, time served pursuant to Section 3582 (c)(1)(A) for defendant with obesity and sleep apnea); *United States v. Zuckerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020)(sentence modified to replace incarceration with an equal period of home detention); *United States v. Resnick*, 2020 WL 1651508(S.D.N.Y Apr. 2, 2020)(defendant who had served 62% of his sentence granted compassionate release due to COVID-19).

That Mr. Fusco was convicted of racketeering and extortion conspiracies, with an increase in the length of his sentence due to the Court's finding of relevant conduct, should not dissuade the Court from granting compassionate release. Numerous courts have granted compassionate release for defendants convicted of dangerous offense conduct and defendants with extensive criminal histories, including career offenders. *See United States v. Galloway*, 2020 WL 2571172,

(D. Md. May 21, 2020) (reducing 235-month sentence to time served for defendant who "served almost 10 years" pursuant to Section 3582(c)(1)(A) based on defendant's numerous medical conditions including aphasia, hypertension, diabetes, hepatitis B, and gastritis); *United States v. McGraw*, 2019 WL 2059488 (S.D. Indiana 2019)( life sentence reduced and defendant released), *United States v. Handy*, 2020 WL 2041666 (D. Md. Apr. 28, 2020) (granting compassionate release and reducing 360-month sentence to 227 months, for inmate with debilitated medical condition due to stroke); *United States v. Almontes*, 2020 WL 1812713 (D.  Conn. Apr. 9, 2020) (inmate in need of spinal surgery given time served, reducing 262-month sentence to approximately 15 years, due to concern that defendant would not get necessary medical attention during COVID-19 pandemic); *United States v. Williams*, No. 3:04-Cr-00095-MCR-CJK (N.D. Fla. Apr. 1, 2020) (granting compassionate release of defendant who served 15 years of life sentence for armed robbery to aging prisoner with medical issues making him vulnerable to COVID-19); *United States v. Scott*, No. 7:98-cr-00079-BO, ECF No. 317 (E.D.N.C. Feb. 5, 2020) (reducing 652-month sentence to 299 months, time served for 73-year-old defendant with deteriorating health); *United States v. Davis*, 2020 WL 1083158 (D. Md. Mar. 5, 2020) (granting compassionate release and reducing life sentence to 221 months, time served for 79-year-old defendant requiring chronic care).

The underlying medical conditions that create a high risk to Mr. Fusco of contracting and dying from COVID-19 should alone be enough to establish extraordinary and compelling reasons. However, two additional factors favor release: First, prison is a particularly dangerous place for him at this moment. And second, he has served more time than was recommended by the PSR application of the guidelines during his sentencing. All three factors taken together constitute extraordinary and compelling reasons for reducing his sentence "[b]eyond what is

usual, customary, regular, or common," and these reasons are "so great that irreparable harm or injustice would result if [the relief] is not [granted]." Definition of "Extraordinary" and "Compelling Need," Black's Law Dictionary (11th ed. 2019).

### Factors that Favor Release Pursuant to 18 U.S.C. § 3553(a)

Under section 603(b) of the First Step Act, "Increasing the Use and Transparency of Compassionate Release," when a defendant establishes the existence of extraordinary and compelling circumstances that justify relief, courts must consider the relevant sentencing factors under 18 U.S.C. § 3553(a). Here, an overriding factor under § 3553(a) that was not present at the time of sentencing is Mr. Fusco's potential deadly exposure to the COVID-19 virus while incarcerated. Although the circumstances of his offenses and criminal history may have qualified Mr. Fusco for the sentence this Court originally imposed, his health at sentencing was not relevant at that time; the country had no indication that a pandemic was coming and that Mr. Fusco was likely to face a life-threatening illness because of his incarceration.

Even where underlying conduct is serious, evidence of a defendant's post-arrest rehabilitation is "highly relevant to several of the section 3553(a) factors." *United States v. Pepper*, 562 U.S. 476 (2011)("[A] district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation [which may] support a downward variance from the now-advisory Federal Sentencing Guidelines range").[6] *See also United States v. White*, 655 F.

---

[6] As the Supreme Court explained, post-incarceration conduct is "plainly relevant" to the history and characteristics of the defendant, as well as "pertinent to … serve the general purposes of sentencing set forth formally in section 3553(a) - in particular, to 'afford adequate deterrence to criminal conduct,' 'protect the public from further crimes of the defendant….'" "In assessing... deterrence, protection of the public, and rehabilitation... there would seem to be no better evidence than a defendant's post-incarceration conduct." (*quoting United States v. McManus*, 496 F. 3d 846 (8th Cir. 2007) (Melloy, J., concurring)). *Id*.at 491. Post-sentencing rehabilitation may also "critically inform a sentencing Judge's overarching duty under section 3553(a) to 'impose a sentence sufficient, but not greater than necessary,'" *Id*. Thus, the Court must consider the factors provided by 18 U.S.C. § 3553(a) to the extent that they are applicable.
.

App'x 42, 44 (2d Cir. 2016)("We have observed that 'a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.' *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)"); *United States v. Allen*, 956 F.3d 355 (6th Cir. 2020)( First Step Act provision regarding retroactivity of the Fair Sentencing Act does not prohibit courts from considering a defendant's post-sentencing conduct when deciding whether to reduce his sentence). A district court is thus obliged to account for post sentence conduct when considering the § 3553(a) factors in a motion for resentencing.

These factors favor release of Emilio Fusco. During his 10+ years of incarceration, Mr. Fusco has worked full time as an orderly in the Compound Cleaning Services Department. In addition, he volunteers as a companion in the unit where he lives; he is in charge of pushing any inmate who is wheelchair-bond to pill-line, insulin line, and hospital appointments from 6:00 a.m. to 5:30 p.m. He spends time with elderly patients, helping them with their wheelchairs and other issues, sitting with people who often have no one else in the world at their side (especially during this pandemic when there have been no social visits for a period of many months), and helping them to draft legal documents to advocate for themselves. *See* Affidavits of Inmates, attached as Exhibit F.

In addition to his volunteer activities, he has a strong work history. He has taken and completed numerous vocational and correctional programs and has completed hundreds more hours of educational courses, including, among others, a parenting program, American Jurisprudence law library training, and weight management. *See* Educational Transcript, attached as Exhibit G.  Further, during his 10+ years in prison, Mr. Fusco has an exceedingly minor disciplinary record and a strong record of programming, steady employment, and volunteer work.

In sum, Mr. Fusco's post-incarceration activities and educational efforts have greatly reduced the probability of recidivism. He has devoted his time to bettering himself and committing to being a better person, dedicating himself to the intense study of sociology, literature, philosophy, and American jurisprudence. His disciplinary record demonstrates his rejection of violence and disorder. His willingness to help others, as attested to by the inmate affidavits attached as Exhibit F, illustrates a deep-seated personal change; he has developed a love for helping others physically and emotionally, actively working with them to help them achieve their goals. If released, Emilio Fusco poses no danger to his community and the public. To the contrary, he will be consumed with work and family. Mr. Fusco has secured employment with the Italian Bakery Shop (owner and manager, Joe Santos, can be reached at (413) 231-8208) and they both eagerly await the moment when he will be released so that he may contribute to the successful running of the bakery.

Emilio Fusco is also a source of support for his family. Despite his lengthy term of incarceration, Mr. Fusco has maintained incredibly strong relationships with his family. He has shared in their day to day issues, counseled them when there are problems at home, and has done everything he can to continue to parent his three children. (He has also done what he could to support his mother, who is 85 years old and whom he has not seen in 10 years, as she lives in Italy.) In turn, his family will be there for him upon his release.

This should be given great weight when considering the § 3553(a) factors. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that 'the

punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011)(*quoting Williams*, 337 U.S., at 247).

If released, Mr. Fusco will live at 167 Kenmore Drive, Longmeadow, Massachusetts 01106 with his family, who can be reached by phone at: (413) 426-4461 (Antonio), (413) 636-8959 (Frank), (413)246-6476 (Anna Maria). Fusco plans to conduct the 14-day quarantine at home. The Petitioner's home is a large, ranch-style home that has enough space to allow the petitioner's family to abide by the CDC's six-foot distancing rule.

In sum, Mr. Fusco's conduct and rehabilitation in the past 10 years while incarcerated has been remarkable. The fact that he has a job, a place to live, and a family that needs him waiting for him, support the general purposes of sentencing set forth in § 3553(a), to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."

Conclusion

For all of the above reasons, Emilio Fusco respectfully requests that the Court either convert the remaining 178 months to a period of home detention or reduce his sentence to a period of 122 months (time served) followed by supervised release. In the alternative, Mr. Fusco seeks a recommendation from the Court to the United States Bureau of Prisons ("BOP") that he be temporarily released pursuant to 18 U.S.C. § 3622, until the life-threatening situation created by the coronavirus pandemic is alleviated through the creation and administration of a vaccine.

Respectfully submitted,

*s/s Camille M. Abate*

Camille M. Abate, Esq.
Attorney for Emilio Fusco